ORIGINAL

CV 12 - 1183

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- X

VICTORIANO BRAVO, PRO *SE*

                                    Plaintiff,

                    - against -

U.S. Bank, National Association; U.S. Bancorp
and   FDIC as Receiver of Downey Savings
and Loan Association, F.A.

                                    Defendants
_____X

# SUMMONS ISSUED

COMPLAINT

for DECLARATORY RELIEF

and MONETARY JUDMENT
monetary Judgment

Jury Trial Demanded

## VITALIANO, J.

### BLOOM, M.J

I.       Parties

1 . Plaintiff VICTORIANO BRAVO   reside at

438 East 4th street Brooklyn NY 11218

2. Defendant: U.S. Bank, National Association       *reside at*

425 Walnut Street, Cincinnati, OH 45202

3.Defendant: U.S. Bancorp reside at

1800 Nicollet Mall Minneapolis, MN55402

4. Defendant:FDICas Receiverof Downey Savings & Loan Association, F.A.U.S. Bank, National Association     *reside at*

1601 Bryan Street, Dallas, TX 75201

See; PARTIES' DESCRIPTIONS  attached herein



RECEIVED
MAR 0 9 2012
PRO SE OFFICE

II.              The Juridiction of the Court is invoked persuant  to:

1. Victoriano Bravo is a  a citizen and civilian of the State of New York  who at all times

material hereto resided within the jurisdiction of this court.

2..an actual and justiciable controversy exists over the parties' respective rights and obliga-

tions under the basic principal of  contract law . This controversy can be fully  resolved  by way

of a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a)

## PARTIES DESCRIPTIONS (1pg)

1.      Plaintiff VICTORIANO BRAVO is a US citizen residing in Kings County that acquired a loan from Downey Savings and Loan Association, F.A. in October 20, 2005 with  principal place of business at   3501 Jamboree RD  Newport Beach, CA 92660

2.      Upon information and belief, Defendant U.S. Bank, National Association  is a nationally chartered bank, regulated by the Office of the Comptroller of the Currency, Department of the Treasury that acquired Downey Savings and Loan Association, F.A., in a FDIC bid November 21,2008 when Downey the failed Insured Deposits. U.S. Bank, National Association principal place of business is     ...425 Walnut Street, Cincinnati, OH 45202

3.      Upon information and belief, Defendant U.S. Bancorp, Investors Trust Mortgage and Investment Company, Inc known as  U.S. Bancorp is the parent company of U.S. Bank, National Association, incorporated in Minnesota with its principal place of business at 800 Nicollet Mall Minneapolis, MN 55402

4.      Upon information and belief, Defendant FDIC as Receiver of Downey Savings & Loans located at 1601 Bryan Street, Dallas, TX 75201 is  the FDIC'S Claim receiver Agency of former Downey Savings and Loan Association, F.A.

JURISDICTION AND VENUE (cont )

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds Seventy Five Thousand Dollars ($75,000) and there is diversity of citizenship between Plaintiffs and the Defendants.

4.      This Court has supplemental jurisdiction over any related state law claims pursuant to 28 U.S.C. § 1367.

5.      This Court has personal jurisdiction over Defendant under subsections (a)(l) and(a)(2) of the New York long-arm statute (CPLR § 302) because upon information and belief, Defendants U.S. Bank National Association and U.S. Bancorp have transacted business in this State and in this District, and have committed tortious acts within this State and District.

6.      Defendant U.S. Bank National Association is continually calling the plaintiff ( borrower) and has sent various correspondence asserting that Plaintiff has defaulted the mortgage; attempting to future foreclose the property at issue . By virtue of these dealings in the State of New York and thisDistrict, Defendant is subject to the personal jurisdiction of this Court under CPLR § 302(a)(l) and (2).

7.Venue is proper pursuant to 28 U.S.C. § 1391 because the events that give rise to the claims occurred, in substantial part, in this District. A substantial part of the activity giving rise to Plaintiffs' claims for declaratory relief including the securitization of the mortgage loan at issue, occurred in this District. Each of the Defendants also maintains offices, derives substantial revenue from, and/or regularly transacts or have transacted business within this District.

## III. Statement of Claim

1.      This is an action seeking the Court's declaration that defendants have violated the basic principle of contract law: a party purporting to hold an interest in a promissory note secured by a Security Deed that was acquired by transfer, grant, or assignment must be able to prove that he is the "holder in due course"….. and that the interest before it can enforce the note. This is also an action for seeking a monetary judgment that entitles plaintiff, VICTORIANO BRAVO to recover $1,476,556.67 Dollars for actual and future damages he has and will incurred caused by the unlawful actions of the defendants.

2.      On September 29, 2010; defendant U.S. Bank, National Association an Unlawful Owner of the Mortgage and the Adjustable rate note of the property 438 East 21st street Brooklyn NY 11226 through an illegally formed "ALLONGE TO NOTE" (See: Exhibit U.S. Bank, record ARN pgs1- 9 .)

3.      Defendant, U.S. Bank, National Association is usually calling asking VICTORIANO BRAVO asking him to bring the balance current or stating that not even short sale is an option for the subject property; also sending default notices intending to commence a foreclosure proceeding on Victoriano Bravo's real property.(See: Exhibit Default notices pgs1- 2)

4.      Defendant, U.S. Bank, National Association, has illegally collected thousands of Dollars from plaintiff since July -17-209 according to U.S. Bank, account activity report (See: Exhibit U.S. Bank, account activity 1&11) and made demands that amount to an antagonistic assertion of rights. As a result of the parties' conflicting positions, an actual and justificatory controversy exists over the parties' respective rights and obligations.
This controversy can be fully resolved by way of a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

5.      VICTORIANO BRAVO set forth thiscomplain on the following counts:

## Statement of Claim

### COUNT 1

### Declaratory Judgment of Defendants in violation of the basic principle of contract law.

1.      Victoriano Bravo repeats and realleges the previous paragraphs set forth herein:

Upon information and believe on  November 21, 2008, defendant U.S. Bank, National Association bought Downey Savings and Loan Association, F.A., in a FDIC when Downey  failed Insured Deposits [(See:Exhibit U.S. Bank acquired Downey OCC pgs 1-3 and Exhibit  FDIC Downey Failed Bank Report  pgs 1-2 ) information  from:  www.fdic.com and; http://www.failedbankreporter.com/downeysavings_and_loan.htm respectively last visited on 12-20-2012 ] However, U.S. Bank, National Association has failed to send an specific agreement between its agency and  FDIC as Receiver of Downey Savings  and Loan Association, F.A., referring to  the Adjustable rate note of the property 438  East  21st  street  Brooklyn  NY 11226 herein referred as the subject  property

2.      On or about October  20, 2005, Victoriano Bravo  entered into an agreement for a loan for the sum of $496,000.00 from Downey Savings and Loan Association, F.A.,  According  to the document, the MORTGAGE # 9041823477  was dated on October  20, 2005, in Kings County recorded document number ID:2005110900899002001EFB27 (See: Exhibit Mtg Cover  pgs 1)   A copy of the recorded  MORTGAGE October  20, 2005, is attached hereto as  (See:Exhibit Kings County recorded mortgage  pg1- 27 ) and (See:Exhibit US Bank  record mortgage pgs1-27 )

3      Victoriano Bravo, by  looking through  his mortgages files around  mid last year when he asked for a Loan Modification from  U.S. Bank, National Association find out  that he did  not obtained a copy of the Mortgage and nor  PROMISSORY ADJUSTABLE  RATE  NOTE at  closing. Victoriano Bravo a faithful Mortgage payee since 2005 is facing a hardship for first time. Asking himself how he got into a Mortgage that it has been financially hard to maintain (he was qualify into this Mortgage by  his credit score and the down payment regardless of his income.)

4      Victoriano Bravo went to Kings County Clerk Record Office and pulled out the recorded mortgage at issue  and U.S. Bank, National Association is not recorded as lender . Victoriano Bravo closed two loans the same day for the same subject property; a Line of Credit(See: Exhibit Line of credit  Cover  pg 1) and a Mortgage  loan from  Downey Savings and Loan Association, F.A. Victoriano Bravo received a closing package which only contained the complete Line of Credit Loan

pg. 4

papers. But on the Mortgage at issue from Downey Savings and Loan Association, F.A., contained only the financial paper work. It was included the complete settlement statement and excluded the Mortgage ,the PROMISSORY ADJUSTABLE RATE NOTE and the TILA Right to Rescind the Mortgage Loan. It is established in Truth and Lending rules that if lender has not complied with this disclosure notice requirements, the cancellation period begins when the Lender has complied.

5        On around  august  2011 U.S. Bank, National Association denied the Loan Modification due to the excessive forbearance of the Loan At issue according the explanation given by phone from an agent of U.S. Bank, National Association at the time of denial. The decision were base on the original   terms of the loan at issue.(See: Exhibit U.S. Bank denied Modf.) In light of that adversity Victoriano Bravo started searching on his loan documents terms and eventually find out that has been violated and that he is another Spanish victim of predatory lenders.   By looking through this documents' shortness he find out that his rights under the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1667f, and the Federal Reserve Board's Regulation Z, 12 C.F.R. § 226.1-.58. have been violated. He is stacked  with an Adjustable Rate Mortgage Note that in seven years of payments has gone down to around $2000.Dollars. Such, with very confusing  financial terms [(See: Exhibit U.S. Bank Acc activity pg 1 & 9) and (Exhibit U.S. Bank record FTIL Disclosure pg-1)]  and  two  loans . Consequently, Victoriano Bravo send a requirement for proof of claim by December 21, 2011 to all the deffendants. (See:Exhibit defendants  Proof of Claim  and U.S. Bank cover envelope pgs 1-4)

6        Looking throughout the basic of the documentation of the loan at issue, the following conceptions are allured:

7        Victoriano Bravo, did not have an early disclosure of the about the variable rate feature as stated at  the bottom of  Truth and Lending Disclosure final sent by U.S. Bank, National Association. (See:Exhibit U.S. Bank record FTIL Disclosure pg-1)

8        The Loan amount financed by Downey Savings and Loan Association, F.A., is $545600. on taxable mortgage amount (See: Exhibit Mtg Cover  pgs 1); $481,401.88 on the Truth and Lending Disclosure final (See:Exhibit U.S. Bank record FTIL Disclosure pg-1);  $496,000. on the mortgage and allonge to note [ (See:Exhibit Kings County recorded mortgage pg2)(See:Exhibit US Bank  record mortgage pg2) and (See: Exhibit U.S. Bank, record ARN pg 9)]

9        As a provision agree by Victoriano bravo on the Adjustable Rate  Note recorded at Kings County Clerk Records Office the interest rate will be based on an  index that according to Victoriano Bravo  has been wrongly calculated by former Downey Savings and Loan Association, F.A.

and U.S. Bank, National Association to overcharge the monthly amount on Victoriano bravo's mortgage loan.[(See:Exhibit Kings County recorded mortgage pgs23- 2D) and(See: Exhibit U.S. Bank Acc activity pgs 1 & 9)]

10      U.S. Bank, National Association has failed to send an specific agreement between its agency and FDIC as Receiver of DowneySavings and Loan Association, F.A.
Moreover, when U.S. Bank, National Association bought the note at issue it was supposed to check the paper work how at it is stated by FDIC regulation. A correction of defects on obtained assets documentation should had been and consequently, provide Victoriano Bravo with a copy TILA Right to Rescind the Mortgage Loan as soon as they found out the legal error

Instead:

11      Since September,29 2010 that U.S. Bank, National Association when they claimed the acquisition of the note at issue they have not provide Victoriano Bravo with such an important document.

12      On September,29 2010 that U.S. Bank, National Association claimed the endorsement of the note at issue through an allonge to the note; according to the documentation in response, send by U.S. Bank, on January 11, 2012. The allonge to the note was registered in Dallas County Texas. Such, creating a totally different patterned ADJUSTABLE RATE NOTE copy with less page than the one the Abstract company recorded at at Kings County Clerk Record Office on 11-17-2005. [(See: Exhibit U.S. Bank, record ARN pg1-4)and ( See; Exhibit Kings County recorded mortgage pgs 22- 26)

13      The created ADJUSTABLE RATE NOTE copy send by U.S. Bank, National Association also contain a Victoriano Bravo forgery signature; see exhibit record ARN page 4 and compare the signature; Victoriano Bravo claims that this is not his signature.

14      The signature on the rider to promissory note and security instrument's copy present a similar problem; the one that the Abstract company recorded at Kings County Clerk Record Office on 11-17-2005. And the signature on US Bank recorded mortgage document copy is the same however, the signature on the rider to promissory note and security instrument contained in the allonge is different [(See: Exhibit Kings County recorded mortgage pgs18- 21 ) ; (See: Exhibit US Bank record mortgage pgs18-21 ) and (Exhibit U.S. Bank, record ARN pg 8)]

15      Victoriano Bravo claims that signature on the rider to promissory note and security instrument contained in the allonge is not his signature.

16    Neither the transfer from FDIC as Receiver of Downey Savings & Loan Association, F.A. to U.S. Bank, National nor the allonge to note endorsement are recorded in Kings County Clerk Record Office and on February 21st 2012 victoriano Bravo called Dallas County Clerk Record Office in Texas and he was told that document number that not exist as ia Dallas County Clerk Recorded document number.

17    Defendant U.S. Bank, National Association agree to show the original note Victoriano Bravo but, in light of what the note and allonge copy shows Victoriano Bravo certainly need Judicial Help to clarify who is "the holder in due" cause of the note at issue

18    Victoriano Bravo, do not know who is the really holder in due cause of the note at issue. Originally, his note was Possessed by Downey Savings and Loan Association, F.A. but there is not an actual evidence of a legal transfer of the note itself except the one that has been fabricated by Defendant U.S. Bank, National Association Such action leave an obvious cloud in the title of the note at issue:  "[a]n instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument."U.C.C-ARTICLE 3 §3-203.Moreover, there has been cases where 2 banks claim the same mortgage in one suject property in foreclosure cases all over U.S.A.

19    Victoriano Bravo is facing a possible claim of the real holder of in due cause of the note at had it been happening all around USA as the mortgage industry is at confusion on Gilbert v. Deutsche Bank Trust Co. Americas, No. 09-CVS-70 the Court denoted:
"Our General Statutes define the "holder" of an instrument as "[t]he person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession." Without a determination of who has physical possession of the Note, no one the can determine, under the UCC, the entity that is the holder of the Note. If such proof were not required, Lenders could negotiate the instrument to a third party who would become a holder in due course, bring a suit upon the note in her own name and obtain a judgment in her favor. Requiring proof that the Lender is the holder of the note at the time of her suit reduces the possibility of such an inequitable occurrence"    Gilbert v. Deutsche Bank Trust Co. Americas, No. 09-CVS-70
*Downey Savings* and *Loan Association, F.A.*v. Trujillo (2011 ) was a similar case litigated in Kings county Supreme Court. The Judge Schack slammed the banks (plaintiff ) procedure in this case and Victoriano Bravo hopes that this case details be carefully examined that he get clarify answers. Class actions has also aroused against *Downey Savings* & *Loan Association*, F.A. and the receiver on interest U.S. Bank, National Association : Carla Giesen et al v. U.S. Bank and US Bancorp 2009 and Zlotnik et al v. US Bancorp in year 2009.  Victoriano Bravo Victoriano Bravo was invited
        to a class action against Downey Savings & Loan Association, F.A. which information is included herein (See: Exhibit Downey litigation notification pg 1 )

20    Actually, Victoriano Bravo is facing an inevitable foreclosure action preannounced with default notice by U.S. Bank, National Association and if he continue paying this Agency without clarifying all this issue will only harm him . (See: Exhibit U.S. Bank default notice pgs 1-2 )

## IV. Damages
## COUNT 2

21.        Victoriano Bravo reaffirms and realleges paragraphs 1 through 20 as if set forth more fully herein below:

22.        Defendants mentioned herein below illegally collect monetary consideration from plaintiff, Victoriano Bravo demands $1,476,556.67 Dollars from Defendants U.S. Bank, National Association and FDIC as Receiver of Downey Savings & Loan Association, F.A. by Defendants U.S. Bank, National Association, collectively, for actual and future damages he has and will incurred caused by the unlawful actions of the defendant.

23.        Defendant U.S. Bank, National Association has received direct pecuniary gain from Victoriano Bravo. (See: Exhibit U.S. Bank Acc activity pgs 1 & 9.) U.S. Bank, National Association has got involve in creating fraudulent documents. U.S. Bank, National Association is not "the holder in due cause " ; neither, has legal authority to collect from the mortgage instrument at issue. U.S. Bank, National Association is an violation of the basic principal of contract law pursuant to UCC§ 3-602. (a) and 3-603 (a)

24.        Defendant US Bancorp is the parent company of defendant U.S. Bank, National Association. It has received pecuniary gain from Victoriano Bravo by collecting payments for a loan that . U.S. Bank, National Association is not "the holder in due cause " ; neither, has legal authority to collect from the mortgage instrument at issue. U.S. Bancorp is an violation of the basic principal of contract law pursuant to UCC§ 3-602. (a) and 3-603 (a)     .

25.        Defendant FDIC as Receiver of Downey Savings & Loan Association, F.A. sold the defective mortgage note to U.S. Bank, National Association in a bid on November 21,2008 received pecuniary gain selling the subject note.

## v. Based on the foregoing, Plaintiff Victoriano Bravo respectfully prays For:

26.     Victoriano Bravo reaffirms and realleges paragraphs 1 through 25 as if set forth more fully herein below:

27.     Determine if Victoriano Bravois entitled to recover the consideration of $$1,476,556.67 Dollars from the Defendants for actual and future damages he has and will incurred caused by the unlawful actions of the defendants and Any such further relief as the court deem just and proper

28.     Determine and declare if failed Downey Savings & Loan Association, F.A had was the lawful "holder in due cause" of the mortgage at issue on or before on November 21, 2008, when the FDIC took over the agency

29.     Determine and declare if Defendant, Defendant FDIC as Receiver of Downey Savings & Loan Association, F.A to act and obtain any remedies thereto.

30.     Determine and declare if Defendant, U.S. Bank, National Association does have the right pursuant to U.C.C. - ARTICLE 3 -§3-104 (a) (b) to act as receiver and exercise any rights or obtain any remedies thereto;

31.     Determine and declare if Defendant, Defendant US Bancorp is the does have the right pursuant to U.C.C. - ARTICLE 3 -§3-104 (a) (b) to act as assignees and exercise any rights or obtain any remedies thereto;

32.     Enter a temporary restraining order preventing Defendants U.S. Bank, National Association from demanding mortgage payments of the loan at issue.

33.     Order that Defendants correct the filings of the endorsement and transfer done on September 29, 2010 in Dallas County to be recorded in Kings County Clerk Record Office;

34.     Enter an order that entitles Victoriano Bravo to receive TILA declaratory Right to Rescind the Mortgage Loan from plaintiff U.S. Bank, National Association

35.     Determine whether Defendants can claim legal ownership through the filing of false and/or forged documents in a public office in Texas and New York.

36.     Determine whether the jurisprudence of non unlawful seizing of real property by parties with fraudulent legal claims, in accordance with Keech v. Stanford (1726) and Carpenter v. Longan (1872 ) may be overturned by this Court.

## VERIFIED STATEMENT

The undersigned Plaintiff, Victoriano Bravo, pro se, a man, and a civilian, hereinafter "Plaintiff", does solemnly declare and state as follows:

1.    Plaintiff is competent to state the matters set forth herein.

2.    Plaintiff has knowledge of the facts stated herein.

3.    All the facts herein are true, correct and complete, not misleading, to the best of Plaintiffs knowledge and belief, and admissible as evidence, and if called upon as a witness, Plaintiff will testify to their veracity.

DATED: this 9th day of March , 2012

BY: _____

Victoriano Bravo, pro se

Cell. (646) 527-7146

37.      Determine whether the jurisprudence of receiving  of any rights from the MORTGAGE to Alternative Loan agencies has no standing Pursuant to Carpenter v Longan (1872), which has never been overturned:  may be overturned by this Court.

38      Interpret the Terms  receiver, buyer and allonge to note  containing within  this mortgage and note  at issue .

36.      Issue a Declaratory Judgment that Defendants have violated the  duty of good faith and dealing in the mortgage contracts with Plaintiffs.

37      Determine and declare if the Defendants, if according to U.S. Bank, National Association and or   FDIC as Receiver of Downey Savings  and Loan Association, F.A.  under  basic principal of the contract  law  can exercise any rights or obtain any remedies thereto.

**Exhibit Mtg Cover 1 pg**

1

*Kings County Clerk Cover Page*



## NYC DEPARTMENT OF FINANCE
## OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2005110900899002001EFB27

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 28 |
|---|---|

**Document ID:** 2005110900899002  Document Date: 10-20-2005  Preparation Date: 11-09-2005
Document Type: MORTGAGE
Document Page Count: 27

| PRESENTER: | RETURN TO: |
|---|---|
| PRECISION ABSTRACT | DOWNEY SAVINGS AND LOAN ASSOCIATION, |
| 31 STEWART STREET | FA |
| AP-PICK UP RSR | P.O. BOX 6060 |
| FLORAL PARK, NY 11001 | 3501 JAMBOREE ROAD |
| 516-358-0505 | NEWPORT BEACH, CA 92658 |
| WP-758K | |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BROOKLYN | 5163 | 13 | Entire Lot | 438 EAST 21 STREET |

Property Type: DWELLING ONLY - 3 FAMILY

### CROSS REFERENCE DATA

CRFN_____ *or* Document ID_____ *or* _____ Year_____ Reel ___ Page _____ *or* File Number_____

### PARTIES

| MORTGAGER/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| VICTORIANO BRAVO | DOWNEY SAVINGS AND LOAN ASSOCIATION, FA |
| 438 EAST 4TH STREET | 3501 JAMBOREE ROAD |
| BROOKLYN, NY 11218 | NEWPORT BEACH, CA 92660 |

### FEES AND TAXES

| Mortgage | | | Recording Fee: $ | 172.00 |
|---|---|---|---|---|
| Mortgage Amount: | $ | 545,600.00 | Affidavit Fee: $ | 0.00 |
| Taxable Mortgage Amount: | $ | 545,600.00 | NYC Real Property Transfer Tax Filing Fee: | |
| Exemption: | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 2,728.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 6,138.00 | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | |
| TASF: | $ | 1,364.00 | **OF THE CITY REGISTER OF THE** | |
| MTA: | $ | 1,636.80 | **CITY OF NEW YORK** | |
| NYCTA: | $ | 0.00 | Recorded/Filed 11-17-2005 10:24 | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | |
| TOTAL: | $ | 11,866.80 | **2005000638680** | |

*City Register Official Signature*

↓ 545,600.00 ?? altered Amount

*LINE OF Credit Cover Page*

## NYC DEPARTMENT OF FINANCE
## OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



**2005103100466001001E3F7F**

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 6 |
|---|---|---|

**Document ID: 2005103100466001**  Document Date: 10-20-2005  Preparation Date: 10-31-2005
Document Type: MORTGAGE
Document Page Count: 5

**PRESENTER:**
RELIABLE ABSTRACT CO. LLC.
4203 13TH AVENUE 2ND FLOOR
BROOKLYN, NY 11219
718-438-0786
JACOB@RELIABLEABSTRACT.NET

**RETURN TO:**
NCB, CLS BRECKSVILLE
LOCS, LOCATOR 7120
P.O. BOX 5570
CLEVELAND, OH 44101

*Line of credit Mtg
Done THE SAME day
to complement the
Sale AMOUNT*

### PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| BROOKLYN | 5163 | 13 | Entire Lot | | 438 EAST 21ST STREET |

**Property Type:** DWELLING ONLY - 2 FAMILY

### CROSS REFERENCE DATA

CRFN_____ *or* Document ID_____ *or* _____ Year_____ Reel ____ Page _____ *or* File Number_____

### PARTIES

**MORTGAGER/BORROWER:**
VICTORIANO BRAVO
438 E. 4TH STREET
BROOKLYN, NY 11218

**MORTGAGEE/LENDER:**
NATIONAL CITY BANK
6750 MILLER ROAD
BRECKSVILLE, OH 44141

### FEES AND TAXES

| Mortgage | | | | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 61,950.00 | Recording Fee: $ | 62.00 |
| Taxable Mortgage Amount: | $ | 61,950.00 | Affidavit Fee: $ | 0.00 |
| Exemption: | | | NYC Real Property Transfer Tax Filing Fee: | |
| | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 309.50 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 619.00 | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 154.75 | | |
| MTA: | $ | 155.70 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 1,238.95 | | |

**RECORDED OR FILED IN THE OFFICE
OF THE CITY REGISTER OF THE
CITY OF NEW YORK**
Recorded/Filed       11-10-2005 08:57
City Register File No.(CRFN):
**2005000625943**

*Annette M Hill*

***City Register Official Signature***

**Exhibit Kings County recorded mortgage  pg1- 27**

1

Kings County
Clerk Recorded
Mortgage

PSS ( 1 — 27 )

3 fam        Ney gm
                  545,600   WP7758K

Return To:
Downey Savings and Loan
Association, F.A.
P.O. Box 6060, 3501
Jamboree Rd, Newport
Beach, CA  92658-6060

Prepared By:
Downey Savings and Loan
Association, F.A.

**P.O. Box 6060, 3501
Jamboree Rd, Newport
Beach, CA  92658-6060**

**Escrow No.: WP758K**

———————————— [Space Above This Line For Recording Data] ————————————

**Title Order No.: WP758K**

# MORTGAGE APN:

**WORDS USED OFTEN IN THIS DOCUMENT**
(A) "**Security Instrument.**" This document, which is dated October 20, 2005
together with all Riders to this document, will be called the "Security Instrument."
(B) "**Borrower.**" VICTORIANO BRAVO, A Married Man

whose address is 438  E. 4TH STREET, BROOKLYN NY 11226

sometimes will be called "Borrower" and sometimes simply "I" or "me."
(C) "**Lender.**" Downey Savings and Loan Association, F.A.

will be called "Lender." Lender is a corporation or association which exists under the laws of
the United States of America        . Lender's address is 3501 Jamboree Road,
Newport Beach, CA  92660

*NEW YORK* - Single Family - *Fannie Mae/Freddie Mac UNIFORM INSTRUMENT*

9041823477
*Form 3033 1/01*

**-6(NY)** (0008).08
Page 1 of 17          Initials:
VMP Mortgage Solutions, Inc. (800)521-7291

3-Family dwelling.

**(D) "Note."** The note signed by Borrower and dated October 20, 2005 , will be called the "Note." The Note shows that I owe Lender four hundred ninety-six thousand and 00/100

Dollars (U.S. $ 496,000.00 ) plus interest

and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by November 1, 2045 .

**(E) "Property."** The property that is described below in the section titled "Description of the Property," will be called the "Property."

**(F) "Loan."** The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

**(H) "Riders."** All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |

**Rider to Promissory Note and Security Instrument**

**(I) "Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

**(J) "Community Association Dues, Fees, and Assessments."** All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

**(K) "Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."

**(M) "Miscellaneous Proceeds."** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

**(N) "Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

**(P) "RESPA."** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

9041823477

Initials: V.G.

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

## DESCRIPTION OF THE PROPERTY

I give Lender rights in the Property described in (A) through (G) below:

(A) The Property which is located at 438 EAST 21ST STREET

                                                                  [Street]

BROOKLYN                       [City, Town or Village], New York 11226       [Zip Code].

This Property is in KINGS                              County. It has the following legal

description: Legal Description attached hereto and made a part hereof

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

Initials: _V.S._

9041823477

-6(NY) (0005).08                              Page 3 of 17                                                Form 3033 1/01

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

**1. Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

**2. Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

9041823477

Initials: _V Q_

-6(NY) (0005).08          Page 4 of 17          *Form 3033 1/01*

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments For Taxes And Insurance.**

**(a) Borrower's Obligations.**

I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

**(b) Lender's Obligations.**

Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

**(c) Adjustments to the Escrow Funds.**

Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

**4. Borrower's Obligation to Pay Charges, Assessments and Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security

9041823477

Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c)

Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

**(a) Maintenance and Protection of the Property.**

I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

**(b) Lender's Inspection of Property.**

Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

**8. Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9. Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance

9041823477

Initials: _____

-6(NY) (0005).08                    Page 9 of 17                    *Form 3033 1/01*

coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in

9041823477

Initials: _____

value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

**(a) Borrower's Obligations.**

Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

**(b) Lender's Rights.**

Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to

9041823477

delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission.

9041823477

If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time

9041823477

Initials: V 弓

period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements. Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."**

**If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to**

the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

(1) The promise or agreement that I failed to keep or the default that has occurred;

(2) The action that I must take to correct that default;

(3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;

(4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;

(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

**24. Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (*as defined in Section 13 of the New York Lien Law*) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

**25. Borrower's Statement Regarding the Property [check box as applicable].**

☒ This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

☐ This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

☐ This Security Instrument does not cover real property improved as described above.

-6(NY) (0005).08          Page 15 of 17          Initials: V B          9041823477

Form 3033 1/01

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 17 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____

_____ (Seal)
VICTORIANO BRAVO                              -Borrower

_____ (Seal)
                                              -Borrower

_____ (Seal)        _____ (Seal)
                              -Borrower                                       -Borrower

_____ (Seal)        _____ (Seal)
                              -Borrower                                       -Borrower

_____ (Seal)        _____ (Seal)
                              -Borrower                                       -Borrower

9041823477

-6(NY) (0005).08                Page 16 of 17               Form 3033 1/01

**STATE OF NEW YORK,**  Kings                                    County ss:

On the      20th    day of    October, 2005            before me, the undersigned, a notary public in and for said state, personally appeared VICTORIANO BRAVO

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

Tax Map Information:

**SEAL**

**SUSAN DANNA**
**Notary Public, State of New York**
**No. 01DA6077015**
**Qualified in Nassau County**
**Commission Expires July 01, 2006**

9041823477

Initials:  V B.

-6(NY) (0005).08                    Page 17 of 17                                    Form 3033 1/01

# 17

# RIDER TO PROMISSORY NOTE AND SECURITY INSTRUMENT

Loan Number: **9041823477**                    Date: **October 20, 2005**

Property Address: **438 EAST 21ST STREET, BROOKLYN, NY 11226**

This Rider is hereby incorporated into that certain deed of trust/mortgage (Security Instrument), and that certain promissory note (Note), both dated the same date as this Rider executed by Borrower in favor of Downey Savings and Loan Association, F.A. (Lender or Note Holder). Anyone who takes the Note by transfer and who is entitled to receive payments under the Note is also called the Note Holder. All capitalized terms used but not defined in this Rider shall have the same meaning as set forth in the Note and Security Instrument. To the extent that any provisions in this Rider are inconsistent with the Security Instrument and/or the Note, this Rider shall prevail. This Rider is secured by the Security Instrument.

If the Federal Home Loan Mortgage Corporation (FHLMC), the Federal National Mortgage Association (FNMA) or any other investor buys all or some of Lender's rights under the Security Instrument and the Note, the provisions of this Rider, may, at the investor's discretion, no longer have any force or effect. If thereafter the FHLMC or FNMA or any other owner should retransfer the Security Instrument and Note to Lender or Lender's successor in interest, then this Rider shall thereupon be automatically reinstated, without any additional writing or document.

1. LATE CHARGES and ACCRUED INTEREST.

If any installment is not received by Note Holder within fifteen (15) days after its due date, Borrower shall pay Note Holder a late charge in an amount equal to SIX percent (6.000%) of the installment due that is applicable to the payment of principal and interest, or $5.00, whichever is greater. If the fifteen day period ends on a weekend or a holiday, the period is extended to the next business day. Borrower acknowledges that it would be difficult and impractical to fix Note Holder's actual damages arising out of any late payment and that the foregoing late payment charge is a reasonable estimate of the same and shall be presumed to be the actual amount. The provisions of this paragraph shall not limit Note Holder's right, under the Security Instrument or otherwise, to compel prompt performance under the Note. Upon default, accrued and unpaid interest shall further bear interest at the then applicable interest rate until paid.

If Borrower is assessed a late charge and sufficient funds are not available in Borrower's checking account when Lender attempts to debit Borrower's loan payment from Borrower's designated checking account, a "returned item charge" will be assessed in addition to the late charge.

2. INTEREST ON PAST DUE SUMS.

If any sum due under the Note is not paid in accordance with the terms of the Note, including accumulated interest, then the sum(s) not paid shall bear interest at the same rate as the principal, or at the maximum rate allowed by law, whichever is less.

#18

## 3. NOTE HOLDER'S TREATMENT OF PAYMENTS

9041823477

Except as otherwise required by law, Note Holder may apply all payments accepted by Note Holder to any outstanding obligations of Borrower under the Loan Documents in any order or priority Note Holder elects in its sole and absolute discretion. Note Holder may disregard any designation or notation by Borrower (or anyone acting on Borrower's behalf) as to how a payment is to be applied by Note Holder. If Note Holder elects not to accept a payment as permitted under Section 1 of the Security Instrument, Note Holder may return the payment to Borrower regardless of who tendered payment, and in such event, Note Holder shall not have any liability to Borrower or any third party as a result thereof. Borrower shall indemnify, defend, protect and hold Note Holder harmless, from and against all claims, damages, expenses, losses and liabilities, in whatever form, suffered or incurred by Note Holder as a result of Note Holder's return of a payment to Borrower.

## 4. EVENTS OF DEFAULT; REMEDIES.

The following shall constitute additional events of default under the Security Instrument:

(A)   Any person's attempt to reconvey Note Holder's interest in the Property without Note Holder's prior written consent;

(B)   Any person's attempt to have the Note, Security Instrument, this Rider or any of the other Loan Documents declared invalid or unenforceable;

(C)   Any sum due under any of the Loan Documents is not paid when due;

(D)   There is any default under any provision of the Security Instrument; or

(E)   Borrower is in default under any other deed of trust or other instrument secured by the Property.

Note Holder may use in-house counsel or retain outside lawyers to analyze and respond to any event of default, and Note Holder may charge Borrower reasonable attorneys' fees and costs for such analysis and response. Note Holder may add these legal expenses to the Note and/or demand immediate reimbursement from Borrower. Borrower's failure to promptly reimburse Note Holder shall also constitute an event of default under the Security Instrument.

Upon the occurrence of any events of default, all sums secured by the Security Instrument (including all of Note Holder's attorneys' fees and costs) shall at once become due and payable at the option of Note Holder with or without prior notice by Note Holder and regardless of any prior forbearance. In such event Note Holder, at its option, may then or thereafter deliver to the Trustee a written declaration of default and demand to sell the Property and shall cause to be filed of record a written notice of default and election to cause the Property to be sold. Note Holder shall also deposit with the Trustee the Security Instrument and any notes and all documents evidencing expenditures secured thereby. After the lapse of such time as then may be required by law following recordation of such notice of default, and notice of sale having been given as then required by law, the Trustee, without demand on Borrower, shall sell the Property at the time and place specified by such Trustee in such notice of sale, or at the time to which such noticed sale has been duly postponed, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale, except that Note Holder may credit bid at the sale to the extent of the amount owing under the Loan Documents, including the Trustee's fee and expenses. The Trustee may sell the Property as a whole or in separate parcels if there is more than one parcel, subject to such rights as Borrower may have by law to direct the manner or order of sale, or by such other manner of sale which is authorized by law. The Trustee may postpone the sale of all or any portion of the Property by public declaration made by the Trustee at the time and place last appointed for sale. If the Property is sold, the Trustee shall deliver to the purchaser a deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recital in such deed of any matters of fact shall be conclusive proof of the truthfulness thereof.

1D107-2.UFF (09/19/05) CR29678 VC

#19

**9041823477**

Any person, including Borrower, the Trustee or Note Holder may purchase at such sale. After deducting all costs, fees and expenses of the Trustee, including costs of evidence of title in connection with such sale, the Trustee shall apply the remaining proceeds of sale first to payment of all sums expended under the terms of the Security Instrument not yet repaid, with accrued interest at the rate then payable under the Note or notes secured thereby, and then to payment of all other sums secured thereby (including the Note). If there be any proceeds remaining, the Trustee shall distribute them to the person or persons legally entitled thereto.

## 5. HAZARD OR PROPERTY INSURANCE.

Unless Note Holder and Borrower otherwise agree in writing, any insurance proceeds shall be applied first to reimburse Note Holder for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Note Holder's option, in such order and proportion as it may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by the Security Instrument, whether or not then due, and to such components thereof as Note Holder may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Note Holder. If Borrower abandons the Property, or does not answer within 30 days a notice from Note Holder that the insurance carrier has offered to settle a claim, then Note Holder may collect the insurance proceeds. Note Holder may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by the Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

If Borrower obtains earthquake insurance, and other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Note Holder, then (i) Borrower must ensure that such insurance names Note Holder as loss payee and (ii) such insurance shall be subject to this paragraph with respect to use of insurance proceeds.

Note Holder may charge a reasonable fee for the cost of determining whether the building or mobile home securing a loan is located in an area having special flood hazards, subject to applicable law.

## 6. BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE.

Borrower may repay the principal due under the Note at any time. A payment of principal only prior to the Maturity Date (beyond the principal included in the regular monthly payments) is known as a 'Prepayment.' When Borrower makes a Prepayment, Borrower must tell Note Holder in writing that Borrower is doing so. Borrower may not designate a payment as a Prepayment if Borrower has not made all the monthly principal and interest payments due under the Note.

Borrower may make a full Prepayment or qualifying partial Prepayment(s) as long as Borrower pays a Prepayment charge equal to six (6) months' advance interest on any Prepayment(s) made in any twelve (12) month period in excess of twenty percent (20%) of the original principal amount of the Note, at the interest rate in effect under the Note as of the date of each Prepayment. There will be no Prepayment charge for Prepayment(s) made more than three (3) years after the date of the Note. If the Note is an Adjustable Rate Note, the fully indexed interest rate in effect under such Note (i.e. the margin plus the index as defined in such Note), as of the date of any such Prepayment, will be used to calculate the Prepayment charge, subject to any interest rate limit set forth in such Note and without regard to temporary interest rate reductions.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rider.

VICTORIANO BRAVO
_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

9041833477

Page 4 of 4

1D107-4.UFF (09/19/05) CR29676 VC

# ADJUSTABLE RATE RIDER
### (12-Month Treasury Average Index)
### (Payment and Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **20th** day of **October** , **2005** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Downey Savings and Loan Association, F.A.**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

### 438 EAST 21ST STREET, BROOKLYN, NY 11226

[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

### 2. INTEREST
#### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Until the first day of the calendar month that immediately precedes the first payment date set forth in Section 3(A) below, I will pay interest at a yearly rate of **6.413 %**. Thereafter, until the first Interest Change Date (as defined in Section 3(C) below), I will pay interest at a yearly rate of **1.250 %**. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**9041823477**

**MULTI STATE ADJUSTABLE RATE RIDER - MTA Index** – Single Family

1141R1.UFF (01/12/2001) 7970 VC                 Page 1 of 5                 Initial: _V. G._      1/01

#22

**(B) Interest Change Dates**

The interest rate I will pay may change on the first day of **December** , **2005** and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C) Interest Rate Limit**

My interest rate will never be greater than **10.950** %.

**(D) Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the monthly yields ("Monthly Yields") on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)." The Twelve-Month Average is determined by adding together the Monthly Yields for the most recent twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding three and one-quarter percentage point(s) **3.250** % to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Change Date.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay Principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **December 1** , **2005** . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before Principal. If, on **November 1, 2045** , I still owe amounts under this Note, I will pay these amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 6060, 3501 Jamboree Rd, Newport Beach, CA 92658-6060**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be U.S. $ **1,313.64** . This amount may change.

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first day of **December** , **2006** , and on that day every 12th month thereafter. Each of these

9041823477

#23

dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to one hundred **ten** percent ( **110** %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that maximum amount due to the limited payments and interest rate increases. If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date at my current interest rate in substantially equal payments.

**(G) Required Full Payment**

On the 5th Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be

9041823477

1141R3.UFF (01/12/2001) 7970 VC          Page 3 of 5          Initials: V.B.          1/01

#24

given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

9041823477

I141R4.UFF (01/12/2001) 7970 VC

Page 4 of 5

Initials: _V B_   1/01

#25

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
**VICTORIANO BRAVO**              -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

[Sign Original Only]
**9041823477**

1141R5.UFF (05/09/03) CR-2054 VC          Page 5 of 5          Initials: V B.   1/01

#26

## Schedule A Description

Title Number **WP-758K**

Page    1

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE LYING AND BEING IN THE BOROUGH OF BROOKLYN, COUNTY OF KINGS, CITY AND STATE OF NEW YORK, BOUNDED AND DESIGNATED ON A CERTAIN MAP ENTITLED "ADDITIONAL NO. 2 VANDERVEER PARK BELONGING TO GERMANIA REAL ESTATE AND IMPROVEMENT CO. FLATBUSH KINGS COUNTY, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WESTERLY SIDE OF EAST 21ST STREET, DISTANT 63 FEET 8-1/2 INCHES, MORE OR LESS SOUTHERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE WESTERLY SIDE OF EAST 21ST STREET WITH THE SOUTHERLY SIDE OF AVENUE "C";

THENCE WESTERLY AT RIGHT ANGLES TO EAST 21ST STREET, 105 FEET;

THENCE SOUTHERLY PARALLEL WITH EAST 21ST STREET, 20 FEET;

THENCE EASTERLY AGAIN AT RIGHT ANGLES TO EAST 21ST STREET AND PART OF THE DISTANCE THROUGH A PARTY WALL, 105 FEET TO THE WESTERLY SIDE OF EAST 21ST STREET;

THENCE NORTHERLY ALONG THE WESTERLY SIDE OF EAST 21ST STREET, 20 FEET TO THE POINT OR PLACE OF BEGINNING.

#27

OMB No. 2502-0265

A. SETTLEMENT STATEMENT    U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

| B. Type of Loan | | |
|---|---|---|
| 1. ☐ FHA | 2. ☐ FmHA | 6. File Number: |
| 4. ☐ VA | 5. ☐ Conv. Ins. | 7. Loan Number: 9041823477 |
| 3. ☒ Conv. Unins. | | 8. Mortgage Insurance Case Number: |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name and Address of Borrower(s): | E. Name and Address of Seller(s): |
|---|---|
| VICTORIANO BRAVO | MOHAMMED SALAH UDDIN |
| 438 EAST 21ST STREET | MOHAMMED ZAFAR ULLAH |
| BROOKLYN, NY 11226 | BIDYUT DAS |

| F. Name and Address of Lender: | G. Property Location: |
|---|---|
| DOWNEY SAVINGS & LOAN ASSOCIATION, F.A. | 438 EAST 21ST STREET |
| 1100 E. WOODFIELD LAKE #433 | BROOKLYN, NY 11226 |
| SCHAUMBURG, IL 60173 | |

| Place of Settlement: | H. Name of Settlement Agent: |
|---|---|
| 1507 AVENUE M | SUSLOVICH & KLEIN, ESQS. |
| BROOKLYN, NY 11230 | I. Settlement Date:   Funding Date: |
| | 10-20-2005             10-20-2005 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower | | 400. Gross Amount Due To Seller | |
| 101. Contract sales price | 620,000.00 | 401. Contract sales price | 620,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 21,782.95 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes          to | 481.00 | 406. City/town taxes          to | 481.00 |
| 107. County taxes             to | | 407. County taxes             to | |
| 108. Assessments              to | | 408. Assessments              to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. Gross Amount Due From Borrower | 642,263.95 | 420. Gross Amount Due To Seller | 620,481.00 |
| 200. Amounts Paid By Or In Behalf Of Borrower | | 500. Reductions In Amount Due To Seller | |
| 201. Deposit or earnest money | 31,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 496,000.00 | 502. Settlement charges to seller (line 1400) | 22,112.72 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan          WASHINGTON MUTUTAL | 369,328.13 |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes          to | | 510. City/town taxes          to | |
| 211. County taxes             to | | 511. County taxes             to | |
| 212. Assessments              to | | 512. Assessments              to | |
| 213. NON-DISC ADJUSTMENT | | 513. NON-DISC ADJUSTMENT | |
| 214. | 500.00 | 514. | 500.00 |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | 527,500.00 | 520. Total Reduction Amount Due Seller | 391,940.85 |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross amount due from borrower (line 120) | 642,263.95 | 601. Gross amount due to seller (line 420) | 620,481.00 |
| 302. Less amounts paid by/for borrower (line 220) | 527,500.00 | 602. Less reductions in amount due seller (line 520) | 391,940.85 |
| 303. Cash ☒ From ☐ To Borrower | 114,763.95 | 603. Cash ☒ To ☐ From Seller | 228,540.15 |

*Victoriano at closing
settlement statement*

(1-3)



### L. Settlement Charges

| 700. Total Sales/Broker's Commission based on price $    @    % = Division of Commission (line 700) as follows: | Paid From Borrowers Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|
| 701. $ 10,000.00          to FELIX RIOS REALTY | | |
| 702. $          to | | |
| 703. Commission paid at Settlement | | 10,000.00 |
| 704. | | |

| 800. Items Payable In Connection with Loan | | |
|---|---|---|
| 801. Loan Origination Fee          0.5 %          to ERETZ FUNDING, LTD. | 2,480.00 | |
| 802. Loan Discount          0 %          to DOWNEY SAVINGS & LOAN ASSOCIATION | | |
| 803. APPRAISAL FEE    TO          ERETZ FUNDING, LTD.          (POC $550.00) | | |
| 804. CREDIT REPORT TO          INFORMATIVE RESEARCH | 12.00 | |
| 805. APPRAISAL REVIEW FEE  TO          DOWNEY SAVINGS & LOAN ASSOCIATION | 65.00 | |
| 806. PROCESSING FEE TO          ERETZ FUNDING, LTD. | | |
| 807. DOCUMENT FEE  TO          DOWNEY SAVINGS & LOAN ASSOCIATION | 200.00 | |
| 808. UNDERWRITING FEE   TO          DOWNEY SAVINGS & LOAN ASSOCIATION | 325.00 | |
| 809. TAX SERVICE FEE   TO          LAND AMERICA NATIONAL LENDER SVC | 56.00 | |
| 810. FLOOD DETERMINATION TO          LAND AMERICA | 8.00 | |
| 811. FLOOD MONITORING     TO          LAND AMERICA | 4.00 | |
| 812. WIRE FEE  TO          DOWNEY SAVINGS & LOAN ASSOCIATION | 50.00 | |
| 813. YIELD SPREAD TO ERETZ FUNDING, LTD. FROM DOWNEY SAVINGS  (POC $11,160.00) | | |
| 814. | | |

| 900. Items Required By Lender To Be Paid In Advance | | |
|---|---|---|
| 901. Interest from  10-20-2005  to  11- 1-2005          @  $ 88.3600  /day | 1,060.32 | |
| 902. Mortgage Insurance premium for          months to | | |
| 903. Hazard insurance premium for          1          year(s) to          (POC $2207.00) | | |
| 904. 1ST & 2ND QTR REAL ESTATE TAX  TO          PRECISION ABSTRACT  (POC $1220.56) | | |
| 905. 2004/2005 REAL ESTATE TAXES          (POC $2441.12) | | |

| 1000. Reserves Deposited With Lender | | |
|---|---|---|
| 1001. Hazard Insurance          3  months @ $          183.92  per month | 551.76 | |
| 1002. Mortgage insurance          months @ $          per month | | |
| 1003. City property taxes          5  months @ $          203.42  per month | 1,017.10 | |
| 1004. County property taxes          months @ $          per month | | |
| 1005. Annual assessments          months @ $          per month | | |
| 1006.          0  months @ $          per month | | |
| 1007.          months @ $          per month | | |
| 1008. Aggregate Escrow Adjustment | -407.03 | |

| 1100. Title Charges | | |
|---|---|---|
| 1101. Settlement or closing fee to | | |
| 1102. Abstract or title search to | | |
| 1103. Title examination to | | |
| 1104. Title insurance binder to | | |
| 1105. Document preparation to | | |
| 1106. Notary fees to | | |
| 1107. Attorney's fees to SUSLOVICH & KLEIN, ESQS.          (Includes above item numbers:  ) | 850.00 | |
| 1108. Title Insurance to PRECISION ABSTRACT          (Includes above item numbers:  ) | 3,608.00 | |
| 1109. Lender's coverage    $ 545,600.00          Premium $ 679.00 | | |
| 1110. Owner's coverage    $ 620,000.00          Premium $ 2,929.00 | | |
| 1111. ENDORSEMENTS | 75.00 | |
| 1112. OPEN WATER & SEWER FOR PRECISION | | 447.72 |
| 1113. | | |

| 1200. Government Recording and Transfer Charges | | |
|---|---|---|
| 1201. Recording fees: DEED, MORTGAGE, SAT | 385.00 | 100.00 |
| 1202. City/county tax/stamps: | | 8,835.00 |
| 1203. State tax/stamps: | | 2,480.00 |
| 1204. NYS MORTGAGE RECORDING TAX PAID BY LENDER  (POC $1364.00) | 10,472.80 | |
| 1205. E-DOCS PREP | | |

| 1300. Additional Settlement Charges | | |
|---|---|---|
| 1301. SURVEY  TO  PRECISION ABSTRACT | 115.00 | |
| 1302. COURIER FEE  TO  SUSLOVICH & KLEIN | 20.00 | |
| 1303. MUNICIPALS  TO  PRECISION ABSTRACT | 685.00 | |
| 1304. TITLE CLOSER | 150.00 | 250.00 |
| 1305. | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | 21,782.95 | 22,112.72 |



CERTIFICATION : I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I received a copy of the HUD-1 Settlement Statement.

_____          _____          _____          _____
Signature of Borrower                      Signature of Borrower                      Signature of Seller                          Signature of Seller

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds disbursed or to be disbursed by the undersigned as part of the settlement of this transaction.

_____          _____
Signature of Settlement Agent                                              Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form.  Penalties upon conviction can include a fine and imprisonment.  For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**Exhibit U.S. Bank acquired Downey OCC pgs 1-3**

1

 *US BANK acquired Downey OCC (1-3)*

**Comptroller of the Currency**
**Administrator of National Banks**

Central District Office
One Financial Place, Suite 2700
440 South LaSalle Street
Chicago, Illinois 60605

November 21, 2008

**Corporate Decision #2008-09**
**December 2008**

Ms. Karen J. Canon
Associate General Counsel
U.S. Bank National Association
U.S. Bancorp Center
800 Nicollet Mall, BC-MN-H21N
Minneapolis, Minnesota 55402

Re:  Application for U.S. Bank, National Association, Cincinnati, Ohio to Acquire Assets and
      Liabilities from Downey Savings and Loan Association, F.A., Newport Beach, California
      Application Control Number:  2008-CE-02-038

Dear Ms. Canon:

The Office of the Comptroller of the Currency ("OCC"), for the reasons discussed below, hereby
approves the application of U.S. Bank, National Association, Cincinnati, Ohio ("US Bank") to
acquire assets and liabilities from Downey Federal Savings and Loan Association, Newport
Beach, California ("Downey"). This approval is granted following review of the application,
other materials you have supplied, and other information available to the OCC, including
commitments and representations made in the application and by representatives of US Bank
during the application process. As discussed below, the transaction may be consummated
immediately upon approval.

**PROPOSAL**

Downey, a federal savings association with deposits insured by the Federal Deposit Insurance
Corporation ("FDIC"), was closed by the Office of Thrift Supervision on November 21, 2008,
and the FDIC was appointed as receiver. The FDIC sought bids from potential acquirers to
acquire Downey. US Bank was the winning bidder. Downey has branches in Arizona and
California. US Bank is a national bank with deposits insured by the FDIC. It has branches in
several states, including California and Arizona.

ANALYSIS

### Authority for the transactions and branch retention

National banks have long been authorized to purchase assets and assume liabilities of other depository institutions as an activity incidental to banking under the authority of 12 U.S.C. § 24(Seventh).[1] Consequently, US Bank may acquire deposits and assets of Downey as proposed.[2] Moreover, as authorized by 12 U.S.C. § 36(c), and applicable intrastate branching laws of California and Arizona as applied to national banks under § 36(c),[3] the OCC concludes that US Bank has authority to retain and operate as branches the main office and branches of Downey in California and Arizona.

### Bank Merger Act

The OCC reviewed the proposed purchase and assumption transaction between US Bank and Downey under the factors set forth in the Bank Merger Act ("BMA"),[4] and applicable OCC regulations and policies. The OCC considered these factors and found them consistent with approval. In addition, the OCC finds that it must act immediately under the standards set forth in the BMA to approve the proposed acquisition by US Bank of Downey.[5]

### Community Reinvestment Act

The Community Reinvestment Act ("CRA") requires the OCC to take into account the applicants' record of helping to meet the credit needs of the community, including low-and-moderate-income ("LMI") neighborhoods, when evaluating certain applications, including transactions that are subject to the BMA.[6] The OCC considers the CRA performance evaluation of each institution involved in the transaction. A review of the record of these applicants and other information available to the OCC as a result of its regulatory responsibilities revealed no evidence that the applicants' record of helping to meet the credit needs of their communities, including LMI neighborhoods, is less than satisfactory.

---

[1] *See, e.g., City National Bank of Huron v. Fuller,* 52 F.2d 870, 872 (8th Cir. 1931).

[2] With respect to any assets, subsidiaries, or activities that Downey holds or engages in that are not permitted for national banks, US Bank has represented in its application that it will divest itself of any such nonconforming or impermissible assets, subsidiaries, or activities, acquired from Downey within two years of the consummation date of this transaction or within any other period of time that the OCC deems appropriate.

[3] Cal. Fin. Code § 500 and Ariz. Rev. Stat. § 6-190.

[4] 12 U.S.C § 1828(c).

[5] 12 *U.S.C. § 1828*(c)(3). Consequently, certain procedural requirements of the BMA are inapplicable to the transaction. 12 U.S.C. § 1828(c)(3), (4)(C), and (6).

[6] 12 U.S.C. § 2903; 12 C.F.R. §§ 5.33(e)(1)(iv), 25.29.



**Consummation guidance**

This approval is granted based on our understanding that other applicable regulatory approvals, non-objections or waivers with respect to the proposed transaction will have been received prior to the consummation of the transaction. Within seven days of consummation of the transaction, please provide the OCC Central District Licensing Department with copies of: a Secretary's Certificate for US Bank certifying that a majority of the board of directors of US Bank approved the transaction and an executed a purchase and assumption agreement.

This approval and the activities and communications by OCC employees in connection with the filing do not constitute a contract, express or implied, or any other obligation binding upon the OCC, the U.S., any agency or entity of the U.S., or any officer or employee of the U.S., and do not affect the ability of the OCC to exercise its supervisory, regulatory and examination authorities under applicable law and regulations. The foregoing may not be waived or modified by any employee or agent of the OCC or the U.S.

If you have questions regarding this letter, please contact me at 312-360-8867 or at carolina.ledesma@occ.treas.gov. Please reference the application control number in any correspondence.

Sincerely,

*Signed*

Carolina M. Ledesma
Acting Director for District Licensing

**Exhibit  FDIC Downey Failed Bank Report  pgs 1-2**

1

December 20, 2011    *FDIC Downey Failed Bank Report (1-2)*



## FDIC Failed Bank Report: Claim Insured Deposits at Failed Banks

### Downey Savings and Loan Association - Newport Beach, CA



2008 FDIC Insured Failed Banks

**Downey Savings and Loan
Association, F.A.**
3501 Jamboree Road
Newport Beach, CA 92658
http://www.downeysavings.com

Established on 10/16/1957 as
Downey Savings And Loan Association

Assets: $12.8 billion

Deposits: $9.7 billion

Cost to FDIC: $1.4 billion

**November 7, 2008:** The banking operations of Downey Savings and Loan Association, F.A. - Newport Beach, CA were sold to U.S. Bank in a transaction facilitated by the Office of Thrift Supervision (OTS) and the Federal Deposit Insurance Corporation (FDIC).

As of September 30, 2008, Downey Savings had assets of $12.8 billion and total deposits of $9.7 billion.

All deposit accounts and all loans have been transferred to U.S. Bank, National Association, Minneapolis, MN. All 170 branches in California and five in Arizona reopened for normal business hours as branches of U.S. Bank. Transferred deposits will be separately insured from any accounts you may already have at U.S. Bank for six months after the sale of Downey.

U.S. Bank also acquired the assets and most of the liabilities, including covered bonds and other secured debt, of Downey Savings and Loan. Claims by equity, subordinated and senior unsecured debt holders were not acquired.

**U.S. Bancorp**
800 Nicollet Mall
Minneapolis, MN 55402
http://www.usbank.com

The FDIC and U.S. Bank entered into a loss share transaction. U.S. Bank will assume the first $1.6 billion of losses on the asset pools of Downey and PFF (also acquired by U.S. Bank) covered under the loss share agreement, equal to the net asset position at close. The FDIC will then share in any further losses. Under the agreement, U.S. Bank will implement a loan modification program similar to the one the FDIC announced pursuant to the failure of IndyMac Bank.

The FDIC estimates that the cost to the Deposit Insurance Fund will be $1.4 billion

For additional information and assistance contact the FDIC at: 800-930-5169 or go to: http://www.fdic.gov/bank/individual/failed/downey.html

---

**Insured deposits:** All deposit accounts have been transferred to U.S. Bank, National Association, and are available immediately.

**Services:** Automated Teller Machines (ATM) remain available at the time of closing, and you may continue to use the services to which you previously had access, such as, safe deposit boxes, night deposit boxes, wire services, etc. Customers are asked to continue to use their existing branch until U.S. Bank can fully integrate the deposit records of Downey Savings.

**Checks:** Checks will be processed as usual. All outstanding checks will be paid against your available balance as if no change had occurred. Your new bank will contact you soon regarding any changes in the terms of your account. If you have a problem with a merchant refusing to accept your check, contact your branch office.

**Interest:** U.S. Bank will be honoring all existing CD rates.

**Withdrawals:** Account owners may withdraw your funds from any transferred account without an early withdrawal penalty until a new deposit agreement is signed with Downey Savings, as long as the deposits are not pledged as collateral for loans.

**Automatic Direct Deposits:** Automatic direct deposits and/or automatic withdrawals will be transferred automatically to your new bank. Contact a representative of your assuming institution at your branch office.

**Loans:** If you had a loan with Downey Savings, you should continue to make your payments as usual. The terms of your loan will not change under the terms of the loan contract because they are contractually agreed to your promissory note with the failed institution. Checks should be made payable as usual and sent to the same address until further notice. If you have further questions regarding an existing loan, you may call 1-800-591-2912.

**Creditor Claims:** U.S. Bank acquired the assets and most of the liabilities of Downey Savings from the FDIC as Receiver for Downey Savings. Any claims by equity holders were not acquired. There was no publicly owned stock in Downey Savings. If you are an equity shareholder, your shares are in Downey Financial Corporation, Newport Beach, CA, the holding company for Downey Savings, and not the institution. Downey

Financial Corporation and the interests of equity, debt holders or other creditors of Downey Financial Corporation are not included in the closure or receivership of the institution. They should contact:

Downey Financial Corporation
3501 Jamboree Rd
Newport Beach, CA 92660

All claims against Downey Savings & Loan, together with proof of the claims, must be submitted in writing to the Receiver at the following address:

FDIC as Receiver of Downey Savings
1601 Bryan Street
Dallas, TX 75201
Attention: Claims Agent

| Consumer Alert | Unclaimed FDIC Insured Deposits |
|---|---|

Note: There are time limits on claims of FDIC-insured bank accounts, CDs and safe deposit boxes ...

If an insured depositor fails to make a claim an insured or transferred deposit within 18 months after the FDIC initiates the payment of insured deposits, the transferee institution must refund the deposit to the FDIC, and all rights of the depositor against the transferee institution are barred.

The FDIC then remits the insured deposit to the custody of the unclaimed property administrator in the account owner's home state, unless that state declines to accept custody. Upon delivery, the FDIC is deemed to have made payment to the depositor, and all rights of the depositor against the FDIC are barred.

Most states allow claims in perpetuity, but there's a reversion clause. If a depositor does not claim the deposit delivered to the custody of the State within 10 years of the date of delivery, the deposit must then immediately be refunded to FDIC, and all rights of the depositor against the state are barred.

It's important to note that if a state declines to accept custody of the deposit - which they sometimes do - the depositor must claim the funds from the FDIC before the receivership is terminated, or all rights of the depositor with respect to the deposit are barred. Dividends for credits arising from uninsured portions of a deposit may, however, be claimed after the receivership is terminated if a dividend check was returned by the post office for a bad address.

Be aware that due to the number of mergers and acquisitions in the banking industry over the years, it is possible you or a deceased family member might well have an account at a failed bank and not know it. Additionally, unclaimed safe deposit boxes at closed branches may be drilled and the contents sold at auction just weeks after closing, so prompt action is advised. For assistance go to: Unclaimed Account Search

**History:** Established on 12/7/1981 as Downey Savings And Loan Association
1990 Acquired Butterfield Savings and Loan Association FSA (with FDIC assistance)
1995 Changed name to Downey Savings And Loan Association, F.A.

| SITEMAP | TERMS OF USE | **FAILED BANK REPORTER HOME** | FAQ | CONTACT US |
|---|---|---|---|---|

© 2008 NUPA - NATIONAL UNCLAIMED PROPERTY ASSOCIATES

# **US bank**

All of **us** serving you®

3121 Michelson Drive, Suite 500
Irvine, CA 92612

*US Bank Respond Cover①*

Maria Fernandez
U.S. Bank Home Mortgage
800.824.6902
Fax: 866.773.9938

**VIA U.S. MAIL**

January 11, 2012

Victoriano Bravo
438 E. 21st Street
Brooklyn, NY 11226-6098

Re:   **Loan No. 9041823477**
      **Property: 438 E. 21st Street, Brooklyn, NY 112**

Dear Mr. Bravo:

This is in response to your recent correspondence, dated December 19, 2011, and received by
U.S. Bank Home National Association on December 28, 2011.

As you know, the above-referenced loan was originated by Downey Savings, and serviced by
Downey Savings until Downey Savings was closed by the Office of Thrift Supervision on
November 21, 2008. At this time, the FDIC was appointed receiver for Downey Savings, and
concurrent with the receiver appointment, U.S. Bank acquired the loan from the FDIC, among
other loan assets and certain liabilities. The loan has been owned and serviced by the Bank since
the date of origination, and as such, the original Note and Deed of Trust have been and remain in
the Bank's possession. This is not an investor loan.

In your letter, you request proof and validity of the debt evidenced by the above-referenced loan
number. We have enclosed a certified copy of the Adjustable Rate Note (with all riders) and the
Deed of Trust (with all riders), in favor of the former Downey Savings and Loan Association, F.A.
Each of these documents is signed by you and each of these documents evidences your
indebtedness to the Bank. The loan is valid and enforceable, and is being and will continue to be
enforced by the Bank in accordance with the provisions of the Note and Deed of Trust. If, after
review, you still wish to inspect the original Note, please contact Cindy Rumbold at 949-798-6777
to schedule an appointment at the address shown above.

In addition to certified copies of the Note and Deed of Trust, we have enclosed a copy of each of
the loan documents identified below. As a courtesy, these copies are provided without cost.
There will be a $10.00 charge per document for any additional document requested. If you wish
to request further documents, please identify them and provide me with a check payable to U.S.

**usbank.com**

Member FDIC



**US bank.**

All of **us** serving you®

3121 Michelson Drive, Suite 500
Irvine, CA 92612

*US Bank Respond Cover ②*

Bank in the required amount. Please note, however, that if the documents are proprietary to the Bank, copies will not be provided. The additional documents enclosed are as follows:

- Loan Application (final)
- Truth-in-Lending Disclosure (final)
- Good Faith Estimate (final)
- Adjustable Rate Mortgage Disclosure [watch for Fixed Rate]
- HUD-1 Settlement Statement

*Where is to Rescind Notice??*

Although you indicate that the amount of the debt is disputed, you do not provide any specific details. Regarding the accuracy of the servicing of this loan, we have enclosed a copy of the loan payment history that reflects, among other things, the amount of the loan payments received during the loan period and the application of those funds to principal, interest and/or the escrow account, as applicable under the terms of the loan. If you believe a loan payment was misapplied, please identify any disputed monthly loan and/or escrow payments and provide us with the specific reasons, including sufficient supporting documentation, if any, so that we can investigate.

Finally, we note that your letter includes "default provisions." Please be aware that the Bank categorically rejects the claimed "default provisions".

We hope this information is helpful to you. If you have any questions or require assistance in the future, you may contact U.S. Bank through our Internet website at www.usbankhomemortgage.com, or call our Customer Service Department at 1-800-824-6902.

Sincerely,

Maria Fernandez

Enclosure

Member FDIC

**Exhibit US Bank  record mortgage pgs1-27**

1

*US BANK Record MRTS + Cover*



## NYC DEPARTMENT OF FINANCE
## OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2005110900899002001EFB27

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 28 |
|---|---|

| Document ID: 2005110900899002 | Document Date: 10-20-2005 | Preparation Date: 11-09-2005 |
|---|---|---|

Document Type: MORTGAGE
Document Page Count: 27

| PRESENTER: | RETURN TO: |
|---|---|
| PRECISION ABSTRACT | DOWNEY SAVINGS AND LOAN ASSOCIATION, |
| 31 STEWART STREET | FA |
| AP-PICK UP RSR | P.O. BOX 6060 |
| FLORAL PARK, NY 11001 | 3501 JAMBOREE ROAD |
| 516-358-0505 | NEWPORT BEACH, CA 92658 |
| WP-758K | |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BROOKLYN | 5163 | 13 | Entire Lot | 438 EAST 21 STREET |

Property Type: DWELLING ONLY - 3 FAMILY

### CROSS REFERENCE DATA

CRFN_____ *or* Document ID_____ *or* _____ Year____ Reel ___ Page ____ *or* File Number_____

### PARTIES

| MORTGAGER/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| VICTORIANO BRAVO | DOWNEY SAVINGS AND LOAN ASSOCIATION, FA |
| 438 EAST 4TH STREET | 3501 JAMBOREE ROAD |
| BROOKLYN, NY 11218 | NEWPORT BEACH, CA 92660 |

### FEES AND TAXES

| Mortgage | | | Recording Fee: $ | 172.00 |
|---|---|---|---|---|
| Mortgage Amount: | $ | 545,600.00 | Affidavit Fee: $ | 0.00 |
| Taxable Mortgage Amount: | $ | 545,600.00 | NYC Real Property Transfer Tax Filing Fee: | |
| Exemption: | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 2,728.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 6,138.00 | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | |
| TASF: | $ | 1,364.00 | OF THE CITY REGISTER OF THE | |
| MTA: | $ | 1,636.80 | **CITY OF NEW YORK** | |
| NYCTA: | $ | 0.00 | Recorded/Filed     11-17-2005 10:24 | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | |
| TOTAL: | $ | 11,866.80 | 2005000638680 | |

*Annette M. Hill*

*City Register Official Signature*

3 fum

Ney gm
545,600  WP758K

Return To:
Downey Savings and Loan
Association, F.A.
P.O. Box 6060, 3501
Jamboree Rd, Newport
Beach, CA 92658-6060

Prepared By:
Downey Savings and Loan
Association, F.A.

**P.O. Box 6060, 3501**
**Jamboree Rd, Newport**
**Beach, CA 92658-6060**

———————— [Space Above This Line For Recording Data] ————————

**Escrow No.: WP758K**

**Title Order No.: WP758K**      MORTGAGE APN:

**WORDS USED OFTEN IN THIS DOCUMENT**
(A) "Security Instrument." This document, which is dated October 20, 2005
together with all Riders to this document, will be called the "Security Instrument."
(B) "Borrower." VICTORIANO BRAVO, A Married Man

whose address is 438  E. 4TH STREET, BROOKLYN NY 11226

sometimes will be called "Borrower" and sometimes simply "I" or "me."
(C) "Lender." Downey Savings and Loan Association, F.A.

will be called "Lender." Lender is a corporation or association which exists under the laws of
the United States of America      . Lender's address is 3501 Jamboree Road,
Newport Beach, CA 92660

I HEREBY CERTIFY THIS TO BE A TRUE AND EXACT
COPY OF THE ORIGINAL
U.S. Bank National Association
Dated: _____
By _____
Name _____
Title _____

9041823477
*Form 3033 1/01*

*NEW YORK* - Single Family - *Fannie Mae/Freddie Mac UNIFORM INSTRUMENT*

VMP®-6(NY) (0005).08
Page 1 of 17      Initials: V.B.
VMP Mortgage Solutions, Inc. (800)521-7291

3-Family dwelling.

(D) "Note." The note signed by Borrower and dated October 20, 2005 , will be called the "Note." The Note shows that I owe Lender four hundred ninety-six thousand and 00/100

Dollars (U.S. $ 496,000.00 ) plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by November 1, 2045

(E) "Property." The property that is described below in the section titled "Description of the Property," will be called the "Property."

(F) "Loan." The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Sums Secured." The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

(H) "Riders." All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider  [ ] Condominium Rider  [ ] Second Home Rider
[ ] Balloon Rider  [ ] Planned Unit Development Rider  [ ] 1-4 Family Rider
[ ] VA Rider  [ ] Biweekly Payment Rider  [X] Other(s) [specify]

### Rider to Promissory Note and Security Instrument

(I) "Applicable Law." All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

(J) "Community Association Dues, Fees, and Assessments." All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

(K) "Electronic Funds Transfer." "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items." Those items that are described in Section 3 will be called "Escrow Items."

(M) "Miscellaneous Proceeds." "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

(N) "Mortgage Insurance." "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment." The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

(P) "RESPA." "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

9041823477

Initials: V.S.

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

## DESCRIPTION OF THE PROPERTY

I give Lender rights in the Property described in (A) through (G) below:

(A) The Property which is located at 438 EAST 21ST STREET

[Street]

BROOKLYN                              [City, Town or Village], New York 11226      [Zip Code].
This Property is in KINGS                                    County. It has the following legal description: Legal Description attached hereto and made a part hereof

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

-6(NY) (0005).08                    Page 3 of 17              Initials: V.G.

9041823477

Form 3033 1/01

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

**1. Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

**2. Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

Initials: V.B.

9041823477

-6(NY) (0005).08

Page 4 of 17

Form 3033 1/01

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

### 3. Monthly Payments For Taxes And Insurance.

#### (a) Borrower's Obligations.

I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

Initials: $\text{J.G.}$

904.1823477

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

(b) Lender's Obligations.

Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

(c) Adjustments to the Escrow Funds.

Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

4. Borrower's Obligation to Pay Charges, Assessments and Claims. I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security

9041823477

Initials: $\underline{V \cdot Q \cdot}$

Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called 'Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c)

Initials: √ ᘜ·                    9041823477

Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

7. **Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

(a) **Maintenance and Protection of the Property.**

I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If Insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

(b) **Lender's Inspection of Property.**

Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

Initials: $\text{N} \mathcal{G}$

9041823477

**8. Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9. Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance

coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in

9041823477

Initials: _V S_

value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

**(a) Borrower's Obligations.**

Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

**(b) Lender's Rights.**

Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to

delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission.

9041823477

If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time

period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements.** Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to

the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

> (1) The promise or agreement that I failed to keep or the default that has occurred;
>
> (2) The action that I must take to correct that default;
>
> (3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;
>
> (4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;
>
> (5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and
>
> (6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

**24. Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

**25. Borrower's Statement Regarding the Property [check box as applicable].**

☒ This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

☐ This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

☐ This Security Instrument does not cover real property improved as described above.

Initials: V B.

9041823477

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 17 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____ (Seal)
VICTORIANO BRAVO                          -Borrower

_____ (Seal)
                                          -Borrower

_____ (Seal)    _____ (Seal)
                         -Borrower                                          -Borrower

_____ (Seal)    _____ (Seal)
                         -Borrower                                          -Borrower

_____ (Seal)    _____ (Seal)
                         -Borrower                                          -Borrower

9041823477

**-6(NY)** (0005).08                Page 16 of 17                *Form 3033 1/01*

**STATE OF NEW YORK,** Kings

County ss:

On the        20th     day of      October, 2005                 before me, the undersigned, a notary
public in and for said state, personally appeared VICTORIANO BRAVO

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the
same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the
individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

Tax Map Information:

SEAL

**SUSAN DANNA**
**Notary Public, State of New York**
No. 01DA6077015
Qualified in Nassau County
Commission Expires July 01, 2006

9041823477

VMP-6(NY) (0005).08                    Page 17 of 17          Initials: V.B.            *Form 3033 1/01*

#17

## RIDER TO PROMISSORY NOTE AND SECURITY INSTRUMENT

Loan Number: 9041823477                     Date: **October 20, 2005**

Property Address: **438 EAST 21ST STREET,** BROOKLYN, NY  11226

This Rider is hereby incorporated into that certain deed of trust/mortgage (Security Instrument), and that certain promissory note (Note), both dated the same date as this Rider executed by Borrower in favor of Downey Savings and Loan Association, F.A. (Lender or Note Holder). Anyone who takes the Note by transfer and who is entitled to receive payments under the Note is also called the Note Holder. All capitalized terms used but not defined in this Rider shall have the same meaning as set forth in the Note and Security Instrument. To the extent that any provisions in this Rider are inconsistent with the Security Instrument and/or the Note, this Rider shall prevail. This Rider is secured by the Security Instrument.

If the Federal Home Loan Mortgage Corporation (FHLMC), the Federal National Mortgage Association (FNMA) or any other investor buys all or some of Lender's rights under the Security Instrument and the Note, the provisions of this Rider, may, at the investor's discretion, no longer have any force or effect. If thereafter the FHLMC or FNMA or any other owner should retransfer the Security Instrument and Note to Lender or Lender's successor in interest, then this Rider shall thereupon be automatically reinstated, without any additional writing or document.

1. LATE CHARGES and ACCRUED INTEREST.

If any installment is not received by Note Holder within fifteen (15) days after its due date, Borrower shall pay Note Holder a late charge in an amount equal to SIX percent (6.000%) of the installment due that is applicable to the payment of principal and interest, or $5.00, whichever is greater. If the fifteen day period ends on a weekend or a holiday, the period is extended to the next business day. Borrower acknowledges that it would be difficult and impractical to fix Note Holder's actual damages arising out of any late payment and that the foregoing late payment charge is a reasonable estimate of the same and shall be presumed to be the actual amount. The provisions of this paragraph shall not limit Note Holder's right, under the Security Instrument or otherwise, to compel prompt performance under the Note. Upon default, accrued and unpaid interest shall further bear interest at the then applicable interest rate until paid.

If Borrower is assessed a late charge and sufficient funds are not available in Borrower's checking account when Lender attempts to debit Borrower's loan payment from Borrower's designated checking account, a "returned item charge" will be assessed in addition to the late charge.

2. INTEREST ON PAST DUE SUMS.

If any sum due under the Note is not paid in accordance with the terms of the Note, including accumulated interest, then the sum(s) not paid shall bear interest at the same rate as the principal, or at the maximum rate allowed by law, whichever is less.

Page 1 of 4                          1D107-1.UFF (09/19/05) CR29678 VC

#18

## 3. NOTE HOLDER'S TREATMENT OF PAYMENTS

9041823477

Except as otherwise required by law, Note Holder may apply all payments accepted by Note Holder to any outstanding obligations of Borrower under the Loan Documents in any order or priority Note Holder elects in its sole and absolute discretion. Note Holder may disregard any designation or notation by Borrower (or anyone acting on Borrower's behalf) as to how a payment is to be applied by Note Holder. If Note Holder elects not to accept a payment as permitted under Section 1 of the Security Instrument, Note Holder may return the payment to Borrower regardless of who tendered payment, and in such event, Note Holder shall not have any liability to Borrower or any third party as a result thereof. Borrower shall indemnify, defend, protect and hold Note Holder harmless, from and against all claims, damages, expenses, losses and liabilities, in whatever form, suffered or incurred by Note Holder as a result of Note Holder's return of a payment to Borrower.

## 4. EVENTS OF DEFAULT; REMEDIES.

The following shall constitute additional events of default under the Security Instrument:

(A)   Any person's attempt to reconvey Note Holder's interest in the Property without Note Holder's prior written consent;

(B)   Any person's attempt to have the Note, Security Instrument, this Rider or any of the other Loan Documents declared invalid or unenforceable;

(C)   Any sum due under any of the Loan Documents is not paid when due;

(D)   There is any default under any provision of the Security Instrument; or

(E)   Borrower is in default under any other deed of trust or other instrument secured by the Property.

Note Holder may use in-house counsel or retain outside lawyers to analyze and respond to any event of default, and Note Holder may charge Borrower reasonable attorneys' fees and costs for such analysis and response. Note Holder may add these legal expenses to the Note and/or demand immediate reimbursement from Borrower. Borrower's failure to promptly reimburse Note Holder shall also constitute an event of default under the Security Instrument.

Upon the occurrence of any events of default, all sums secured by the Security Instrument (including all of Note Holder's attorneys' fees and costs) shall at once become due and payable at the option of Note Holder with or without prior notice by Note Holder and regardless of any prior forbearance. In such event Note Holder, at its option, may then or thereafter deliver to the Trustee a written declaration of default and demand to sell the Property and shall cause to be filed of record a written notice of default and election to cause the Property to be sold. Note Holder shall also deposit with the Trustee the Security Instrument and any notes and all documents evidencing expenditures secured thereby. After the lapse of such time as then may be required by law following recordation of such notice of default, and notice of sale having been given as then required by law, the Trustee, without demand on Borrower, shall sell the Property at the time and place specified by such Trustee in such notice of sale, or at the time to which such noticed sale has been duly postponed, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale, except that Note Holder may credit bid at the sale to the extent of the amount owing under the Loan Documents, including the Trustee's fee and expenses. The Trustee may sell the Property as a whole or in separate parcels if there is more than one parcel, subject to such rights as Borrower may have by law to direct the manner or order of sale, or by such other manner of sale which is authorized by law. The Trustee may postpone the sale of all or any portion of the Property by public declaration made by the Trustee at the time and place last appointed for sale. If the Property is sold, the Trustee shall deliver to the purchaser a deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recital in such deed of any matters of fact shall be conclusive proof of the truthfulness thereof.

1D107-2.UFF (09/19/05) CR:29678 VC

#19

9041823477

Any person, including Borrower, the Trustee or Note Holder may purchase at such sale. After deducting all costs, fees and expenses of the Trustee, including costs of evidence of title in connection with such sale, the Trustee shall apply the remaining proceeds of sale first to payment of all sums expended under the terms of the Security Instrument not yet repaid, with accrued interest at the rate then payable under the Note or notes secured thereby, and then to payment of all other sums secured thereby (including the Note). If there be any proceeds remaining, the Trustee shall distribute them to the person or persons legally entitled thereto.

## 5. HAZARD OR PROPERTY INSURANCE.

Unless Note Holder and Borrower otherwise agree in writing, any insurance proceeds shall be applied first to reimburse Note Holder for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Note Holder's option, in such order and proportion as it may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by the Security Instrument, whether or not then due, and to such components thereof as Note Holder may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Note Holder. If Borrower abandons the Property, or does not answer within 30 days a notice from Note Holder that the insurance carrier has offered to settle a claim, then Note Holder may collect the insurance proceeds. Note Holder may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by the Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

If Borrower obtains earthquake insurance, and other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Note Holder, then (i) Borrower must ensure that such insurance names Note Holder as loss payee and (ii) such insurance shall be subject to this paragraph with respect to use of insurance proceeds.

Note Holder may charge a reasonable fee for the cost of determining whether the building or mobile home securing a loan is located in an area having special flood hazards, subject to applicable law.

## 6. BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE.

Borrower may repay the principal due under the Note at any time. A payment of principal only prior to the Maturity Date (beyond the principal included in the regular monthly payments) is known as a 'Prepayment.' When Borrower makes a Prepayment, Borrower must tell Note Holder in writing that Borrower is doing so. Borrower may not designate a payment as a Prepayment if Borrower has not made all the monthly principal and interest payments due under the Note.

Borrower may make a full Prepayment or qualifying partial Prepayment(s) as long as Borrower pays a Prepayment charge equal to six (6) months' advance interest on any Prepayment(s) made in any twelve (12) month period in excess of twenty percent (20%) of the original principal amount of the Note, at the interest rate in effect under the Note as of the date of each Prepayment. There will be no Prepayment charge for Prepayment(s) made more than three (3) years after the date of the Note. If the Note is an Adjustable Rate Note, the fully indexed interest rate in effect under such Note (i.e. the margin plus the index as defined in such Note), as of the date of any such Prepayment, will be used to calculate the Prepayment charge, subject to any interest rate limit set forth in such Note and without regard to temporary interest rate reductions.

1D107-3.UFF (09/19/05) CR29E78 VC



9041823477

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rider.

_____(Seal)
VICTORIANO BRAVO                        -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

1D107-4.UFF (09/19/05) CR29678 VC

#21

# ADJUSTABLE RATE RIDER
### (12-Month Treasury Average Index)
### (Payment and Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **20th** day of **October** , **2005** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
**Downey Savings and Loan Association, F.A.**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

### 438 EAST 21ST STREET, BROOKLYN, NY 11226

[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

## 2. INTEREST
### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Until the first day of the calendar month that immediately precedes the first payment date set forth in Section 3(A) below, I will pay interest at a yearly rate of **6.413 %**. Thereafter, until the first Interest Change Date (as defined in Section 3(C) below), I will pay interest at a yearly rate of **1.250 %**. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**9041823477**

**MULTI STATE ADJUSTABLE RATE RIDER - MTA Index - Single Family**

1141R1.UFF (01/12/2001) 7970 VC          Page 1 of 5          Initial: _V.G._          1/01

#22

**(B) Interest Change Dates**

The interest rate I will pay may change on the first day of **December** , **2005** , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C) Interest Rate Limit**

My interest rate will never be greater than **10.950** %.

**(D) Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the monthly yields ("Monthly Yields") on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)." The Twelve-Month Average is determined by adding together the Monthly Yields for the most recent twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **three and one-quarter** percentage point(s)

**3.250** % to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Change Date.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay Principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on. **December 1** , **2005** . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before Principal. If, on **November 1, 2045** , I still owe amounts under this Note, I will pay these amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 6060, 3501 Jamboree Rd, Newport Beach, CA 92658-6060**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be U.S. $ **1,313.64** . This amount may change.

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first day of **December** , **2006** , and on that day every 12th month thereafter. Each of these

9041823477



dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to one hundred  **ten**

percent (      **110**    %)

of the Principal amount I originally borrowed. My unpaid Principal could exceed that maximum amount due to the limited payments and interest rate increases. If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date at my current interest rate in substantially equal payments.

**(G) Required Full Payment**

On the 5th Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be

9041823477

#24

given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

9041823477

I141R4.UFF (01/12/2001) 7970 VC             Page 4 of 5             Initials: V.B.     1/01

#25

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
VICTORIANO BRAVO                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

[Sign Original Only]
9041823477

1141R5.UFF (05/09/03) CR-2054 VC          Page 5 of 5          Initials: V.B.   1/01

#26

Schedule A Description

Title Number WP-758K

Page   1

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE LYING AND BEING IN THE BOROUGH OF BROOKLYN, COUNTY OF KINGS, CITY AND STATE OF NEW YORK, BOUNDED AND DESIGNATED ON A CERTAIN MAP ENTITLED "ADDITIONAL NO. 2 VANDERVEER PARK BELONGING TO GERMANIA REAL ESTATE AND IMPROVEMENT CO. FLATBUSH KINGS COUNTY, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WESTERLY SIDE OF EAST 21ST STREET, DISTANT 63 FEET 8-1/2 INCHES, MORE OR LESS SOUTHERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE WESTERLY SIDE OF EAST 21ST STREET WITH THE SOUTHERLY SIDE OF AVENUE "C";

THENCE WESTERLY AT RIGHT ANGLES TO EAST 21ST STREET, 105 FEET;

THENCE SOUTHERLY PARALLEL WITH EAST 21ST STREET, 20 FEET;

THENCE EASTERLY AGAIN AT RIGHT ANGLES TO EAST 21ST STREET AND PART OF THE DISTANCE THROUGH A PARTY WALL, 105 FEET TO THE WESTERLY SIDE OF EAST 21ST STREET;

THENCE NORTHERLY ALONG THE WESTERLY SIDE OF EAST 21ST STREET, 20 FEET TO THE POINT OR PLACE OF BEGINNING.

#27

**Exhibit U.S. Bank, record ARN   pgs 1- 9**

1

*US Bank Record ☒ ARM*

# ADJUSTABLE RATE NOTE
### (12-Month Treasury Average Index)
### (Payment and Rate Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

| October 20, 2005 | BROOKLYN | NY |
|---|---|---|
| [Date] | [City] | [State] |

438 EAST 21ST STREET, BROOKLYN, NY 11226

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 496,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Downey Savings and Loan Association, F.A.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Until the first day of the calendar month that immediately precedes the first payment date set forth in Section 3(A) below, I will pay interest at a yearly rate of **6.413 %.** Thereafter, until the first Interest Change Date (as defined in Section 2(B) below), I will pay interest at a yearly rate of **1.250 %.** The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Change Dates

The interest rate I will pay may change on the first day of **December** , **2005** and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

### (C) Interest Rate Limit

My interest rate will never be greater than **10.950** %.

### (D) Index

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the monthly yields ("Monthly Yields") on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)." The Twelve-Month Average is determined by adding together the Monthly Yields for the most recent twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (E) Calculation of Interest Rate Changes

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **three and one-quarter** percentage point(s) (**3.250** %) to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Change Date.

9041823477

(1-9)   #1

*[Sidebar vertical text:]* I HEREBY CERTIFY THIS TO BE A TRUE AND EXACT COPY OF THE ORIGINAL U.S. Bank National Association Dated: _____ By _Faustina Porcaro_ Name _____ Title _Records Manager_

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay Principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **December 1** **2005** . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before Principal. If, on **November 1, 2045** , I still owe amounts under this Note, I will pay these amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 6060, 3501 Jamboree Rd, Newport Beach, CA 92658-6060** or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be U.S. $ **1,313.64** . This amount may change.

### (C) Monthly Payment Changes

My monthly payment may change as required by Section 3(D) below beginning on the first day of **December** , **2006** , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date.

### (E) Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to one hundred **ten** percent ( **110** %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that maximum due to the limited payments and interest rate increases. If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date at my current interest rate in substantially equal payments.

### (G) Required Full Payment

On the 5th Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

9041823477

#2

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen (15)** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

9041823477

#3

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
VICTORIANO BRAVO        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

[Sign Original Only]

9041823477

#4

# RIDER TO PROMISSORY NOTE AND SECURITY INSTRUMENT

Loan Number: **9041823477**                    Date: **October 20, 2005**

Property Address: **438 EAST 21ST STREET, BROOKLYN, NY   11226**

This Rider is hereby incorporated into that certain deed of trust/mortgage (Security Instrument), and that certain promissory note (Note), both dated the same date as this Rider executed by Borrower in favor of Downey Savings and Loan Association, F.A. (Lender or Note Holder). Anyone who takes the Note by transfer and who is entitled to receive payments under the Note is also called the Note Holder. All capitalized terms used but not defined in this Rider shall have the same meaning as set forth in the Note and Security Instrument. To the extent that any provisions in this Rider are inconsistent with the Security Instrument and/or the Note, this Rider shall prevail. This Rider is secured by the Security Instrument.

If the Federal Home Loan Mortgage Corporation (FHLMC), the Federal National Mortgage Association (FNMA) or any other investor buys all or some of Lender's rights under the Security Instrument and the Note, the provisions of this Rider, may, at the investor's discretion, no longer have any force or effect. If thereafter the FHLMC or FNMA or any other owner should retransfer the Security Instrument and Note to Lender or Lender's successor in interest, then this Rider shall thereupon be automatically reinstated, without any additional writing or document.

## 1. LATE CHARGES and ACCRUED INTEREST.

If any installment is not received by Note Holder within fifteen (15) days after its due date, Borrower shall pay Note Holder a late charge in an amount equal to SIX percent (6.000%) of the installment due that is applicable to the payment of principal and interest, or $5.00, whichever is greater. If the fifteen day period ends on a weekend or a holiday, the period is extended to the next business day. Borrower acknowledges that it would be difficult and impractical to fix Note Holder's actual damages arising out of any late payment and that the foregoing late payment charge is a reasonable estimate of the same and shall be presumed to be the actual amount. The provisions of this paragraph shall not limit Note Holder's right, under the Security Instrument or otherwise, to compel prompt performance under the Note. Upon default, accrued and unpaid interest shall further bear interest at the then applicable interest rate until paid.

If Borrower is assessed a late charge and sufficient funds are not available in Borrower's checking account when Lender attempts to debit Borrower's loan payment from Borrower's designated checking account, a "returned item charge" will be assessed in addition to the late charge.

## 2. INTEREST ON PAST DUE SUMS.

If any sum due under the Note is not paid in accordance with the terms of the Note, including accumulated interest, then the sum(s) not paid shall bear interest at the same rate as the principal, or at the maximum rate allowed by law, whichever is less.

1D107-1.UFF (09/19/05) CR29678 VC

#5

9041823477

### 3. NOTE HOLDER'S TREATMENT OF PAYMENTS

Except as otherwise required by law, Note Holder may apply all payments accepted by Note Holder to any outstanding obligations of Borrower under the Loan Documents in any order or priority Note Holder elects in its sole and absolute discretion. Note Holder may disregard any designation or notation by Borrower (or anyone acting on Borrower's behalf) as to how a payment is to be applied by Note Holder. If Note Holder elects not to accept a payment as permitted under Section 1 of the Security Instrument, Note Holder may return the payment to Borrower regardless of who tendered payment, and in such event, Note Holder shall not have any liability to Borrower or any third party as a result thereof. Borrower shall indemnify, defend, protect and hold Note Holder harmless, from and against all claims, damages, expenses, losses and liabilities, in whatever form, suffered or incurred by Note Holder as a result of Note Holder's return of a payment to Borrower.

### 4. EVENTS OF DEFAULT; REMEDIES.

The following shall constitute additional events of default under the Security Instrument:

(A)   Any person's attempt to reconvey Note Holder's interest in the Property without Note Holder's prior written consent;

(B)   Any person's attempt to have the Note, Security Instrument, this Rider or any of the other Loan Documents declared invalid or unenforceable;

(C)   Any sum due under any of the Loan Documents is not paid when due;

(D)   There is any default under any provision of the Security Instrument; or

(E)   Borrower is in default under any other deed of trust or other instrument secured by the Property.

Note Holder may use in-house counsel or retain outside lawyers to analyze and respond to any event of default, and Note Holder may charge Borrower reasonable attorneys' fees and costs for such analysis and response. Note Holder may add these legal expenses to the Note and/or demand immediate reimbursement from Borrower. Borrower's failure to promptly reimburse Note Holder shall also constitute an event of default under the Security Instrument.

Upon the occurrence of any events of default, all sums secured by the Security Instrument (including all of Note Holder's attorneys' fees and costs) shall at once become due and payable at the option of Note Holder with or without prior notice by Note Holder and regardless of any prior forbearance. In such event Note Holder, at its option, may then or thereafter deliver to the Trustee a written declaration of default and demand to sell the Property and shall cause to be filed of record a written notice of default and election to cause the Property to be sold. Note Holder shall also deposit with the Trustee the Security Instrument and any notes and all documents evidencing expenditures secured thereby. After the lapse of such time as then may be required by law following recordation of such notice of default, and notice of sale having been given as then required by law, the Trustee, without demand on Borrower, shall sell the Property at the time and place specified by such Trustee in such notice of sale, or at the time to which such noticed sale has been duly postponed, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale, except that Note Holder may credit bid at the sale to the extent of the amount owing under the Loan Documents, including the Trustee's fee and expenses. The Trustee may sell the Property as a whole or in separate parcels if there is more than one parcel, subject to such rights as Borrower may have by law to direct the manner or order of sale, or by such other manner of sale which is authorized by law. The Trustee may postpone the sale of all or any portion of the Property by public declaration made by the Trustee at the time and place last appointed for sale. If the Property is sold, the Trustee shall deliver to the purchaser a deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recital in such deed of any matters of fact shall be conclusive proof of the truthfulness thereof.

#6

9041823477

Any person, including Borrower, the Trustee or Note Holder may purchase at such sale. After deducting all costs, fees and expenses of the Trustee, including costs of evidence of title in connection with such sale, the Trustee shall apply the remaining proceeds of sale first to payment of all sums expended under the terms of the Security Instrument not yet repaid, with accrued interest at the rate then payable under the Note or notes secured thereby, and then to payment of all other sums secured thereby (including the Note). If there be any proceeds remaining, the Trustee shall distribute them to the person or persons legally entitled thereto.

## 5. HAZARD OR PROPERTY INSURANCE.

Unless Note Holder and Borrower otherwise agree in writing, any insurance proceeds shall be applied first to reimburse Note Holder for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Note Holder's option, in such order and proportion as it may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by the Security Instrument, whether or not then due, and to such components thereof as Note Holder may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Note Holder. If Borrower abandons the Property, or does not answer within 30 days a notice from Note Holder that the insurance carrier has offered to settle a claim, then Note Holder may collect the insurance proceeds. Note Holder may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by the Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

If Borrower obtains earthquake insurance, and other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Note Holder, then (i) Borrower must ensure that such insurance names Note Holder as loss payee and (ii) such insurance shall be subject to this paragraph with respect to use of insurance proceeds.

Note Holder may charge a reasonable fee for the cost of determining whether the building or mobile home securing a loan is located in an area having special flood hazards, subject to applicable law.

## 6. BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE.

Borrower may repay the principal due under the Note at any time. A payment of principal only prior to the Maturity Date (beyond the principal included in the regular monthly payments) is known as a 'Prepayment.' When Borrower makes a Prepayment, Borrower must tell Note Holder in writing that Borrower is doing so. Borrower may not designate a payment as a Prepayment if Borrower has not made all the monthly principal and interest payments due under the Note.

Borrower may make a full Prepayment or qualifying partial Prepayment(s) as long as Borrower pays a Prepayment charge equal to six (6) months' advance interest on any Prepayment(s) made in any twelve (12) month period in excess of twenty percent (20%) of the original principal amount of the Note, at the interest rate in effect under the Note as of the date of each Prepayment. There will be no Prepayment charge for Prepayment(s) made more than three (3) years after the date of the Note. If the Note is an Adjustable Rate Note, the fully indexed interest rate in effect under such Note (i.e. the margin plus the index as defined in such Note), as of the date of any such Prepayment, will be used to calculate the Prepayment charge, subject to any interest rate limit set forth in such Note and without regard to temporary interest rate reductions.

1D107-3.UFF (09/19/05) CR29678 VC

#7

9041823477

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rider.

_____(Seal)
VICTORIANO BRAVO           -Borrower

_____(Seal)
                           -Borrower

_____(Seal)
                           -Borrower

_____(Seal)
                           -Borrower

_____(Seal)
                           -Borrower

_____(Seal)
                           -Borrower

_____(Seal)
                           -Borrower

_____(Seal)
                           -Borrower

1D107-4.UFF (09/19/05) CR29678 VC

#8

# ALLONGE TO NOTE

RE    NAME **VICTORIANO BRAVO**

ADDRESS   **438E 21ST ST, BROOKLYN, NY 11226**

LOAN # **9041823477**

NOTE DATE  **10/20/2005**
NOTE AMOUNT  **$496,000.00**

Pay to the Order of
U S BANK NATIONAL ASSOCIATION
Without recourse

FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER OF DOWNEY
SAVINGS AND LOAN ASSOCIATION, F A BY U S BANK NATIONAL ASSOCIATION
UNDER LIMITED POWER OF ATTORNEY DATED SEPTEMBER 29, 2010 RECORDED
SEPTEMBER 29, 2010 IN DALLAS COUNTY, TEXAS IN DOCUMENT NUMBER
20100250121

By _____

Name   Karen J Canon, Associate General Counsel of U S Bank National Association
Title  Attorney-In-Fact

Last Page (#9)

**Exhibit U.S. Bank Acc activity pg 1 & 9**

1

```
                    U.S. BANK HOME MORTGAGE
                    P.O. BOX 6060
                    NEWPORT BEACH, CA 92660
                    (800) 824-6902
```

                                                                US Bank

```
REQ BY SCH         CUSTOMER ACCOUNT ACTIVITY STATEMENT        DATE 01/11/12
                                                             PAGE    1

VICTORIANO BRAVO
438 E 21ST ST
BROOKLYN              NY 11226
```

LOAN NUMBER: 9041823477
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

------------------------ CURRENT ACCOUNT INFORMATION ------------------------

| DATE PAYMENT DUE | TOTAL PAYMENT AMOUNT | PRINCIPAL & INTEREST PAYMENT | LOAN INTEREST RATE | CURRENT PRINCIPAL BALANCE | ESCROW BALANCE |
|---|---|---|---|---|---|
| 02-01-12 | 2,557.84 | 2,081.98 | 3.44580 | 494,402.92 | 1,636.51 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

```
                    ACTIVITY FOR PERIOD 01/01/01 - 01/11/12
PROCESS   DUE    TRANSACTION          TRANSACTION              EFFECTIVE DATE
DATE      DATE   CODE                 DESCRIPTION              OF TRANSACTION
-------------------------------------------------------------------------------
 TRANSACTION  PRIN. PAID/      ESCROW PAID/ ------------OTHER-------------
   AMOUNT      BALANCE   INTEREST  BALANCE   AMOUNT  CODE/DESCRIPTION
-------------------------------------------------------------------------------
12-30-11  02-12  160  INTEREST ON ESCROW DEPOSIT
      6.38        0.00       0.00      6.38
                                    1636.51   NEW PRINCIPAL/ESCROW BALANCES
12-20-11  02-12  493  ARM LOAN ADJUSTMENT
   NEW INTEREST RATE:  0.03445     NEW PRIN & INT PAYMENT:   2,081.98
12-16-11  02-12  175  PRINCIPAL PAYMENT
   2,707.92    2,707.92       0.00      0.00
              494,402.92                    NEW PRINCIPAL/ESCROW BALANCES
12-16-11  01-12  173  PAYMENT
   2,557.84      647.81   1,434.17    475.86
              497,110.84               1630.13   NEW PRINCIPAL/ESCROW BALANCES
12-15-11  01-12  175  PRINCIPAL PAYMENT
     104.10      104.10       0.00      0.00
              497,758.65                    NEW PRINCIPAL/ESCROW BALANCES
12-15-11  01-12  493  ARM LOAN ADJUSTMENT
   NEW INTEREST RATE:  0.03457     NEW PRIN & INT PAYMENT:   2,081.98
12-15-11  12-11  173  PAYMENT
   2,557.84      641.51   1,440.47    475.86
              497,862.75               1154.27   NEW PRINCIPAL/ESCROW BALANCES
12-07-11  12-11  313  CITY (TOWN,VILLAGE,BOROUGH)
     924.05-       0.00       0.00    924.05-
                                      678.41   NEW PRINCIPAL/ESCROW BALANCES
11-28-11  12-11  493  ARM LOAN ADJUSTMENT
   NEW INTEREST RATE:  0.03467     NEW PRIN & INT PAYMENT:   2,081.98
```

#1

LN#     9041823477     VICTORIANO BRAVO                                                                       EMP 0    POFO

| DUE DATE | PROC DATE | TP TR | SQ NO | AMOUNT RECEIVED | PRINCIPAL PAID | PRINCIPAL BALANCE | INTEREST PAID | ESCROW PAID | ESCROW BALANCE | ADVANCE BALANCE | STATUS AMOUNT | STATUS BALANCE | UNEARNED INT-BAL. | OTHER AMOUNTS | CFD DCT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | 664.94 | W |
| | | | | | | | | | | | | | | 10-07-09 | L |
| | | | | | | | | | | | | | | 664.94 | AB |
| | | | | | | | | | | | | | | 664.94 | AC |
| | | | | | | | | | | | | | | 664.94 | AE |
| | | | | | | | | | | | | | | 664.94 | AF |
| | | | | | | | | | | BATCH 4T2 EDIT-SEQ 028053 | | | | | |
| 10-09 | 10-14 | 3 51 | 1 | CHECK #WIRE | | | | 2203.60- | 338.48 | PAYEE CD 78544 | | | | | |
| | | | | | | | | | | | | | | 2.23 | P |
| 11-09 | 10-26 | 1 72 | 1 | 2052.32 | 88.44- | 515229.81 | 1720.36 | 420.40 | 758.88 | .00 | .00 | .00 | .00 | | |
| | | | | | | | | | | MPL-ID GLBL | | | | | |
| | | | | | | | | | | | | | | 10-26-09 | L |
| | | | | | | | | | | | | | | .22 | P |
| | | | | | | | | | | | | | | 88.44- | AB |
| | | | | | | | | | | | | | | 88.44- | AC |
| | | | | | | | | | | | | | | 88.44- | AE |
| | | | | | | | | | | | | | | 88.44- | AF |
| | | | | IR EFF 12-09 OLD .0400750 | NEW .0388170 | PRIN BAL | | | | BATCH 601 EDIT-SEQ 007816 | | | | | |
| | | | | PI EFF 12-09 OLD 1,631.92 | NEW 1,754.31 | PRIN BAL | | | | 515,229.81 | | | | | |
| 12-09 | 10-26 | 1 75 | 3 | 622.97 | 622.97 | 514606.84 | .00 | .00 | 758.88 | 515,229.81 .00 | .00 | .00 | .00 | | 1 |
| | | | | | | | | | | MPL-ID GLBL | | | | | |
| | | | | | | | | | | | | | | 10-26-09 | L |
| | | | | | | | | | | | | | | 622.97 | AB |
| | | | | | | | | | | | | | | 622.97 | AC |
| | | | | | | | | | | | | | | 622.97 | AE |
| | | | | | | | | | | | | | | 622.97 | AF |
| | | | | | | | | | | BATCH 601 EDIT-SEQ 007816 | | | | | |
| 12-09 | 11-30 | 1 72 | 1 | 2174.71 | 89.69 | 514517.15 | 1664.62 | 420.40 | 1179.28 | .00 | .00 | .00 | .00 | | 1 |
| | | | | | | | | | | MPL-ID GLBL | | | | | |
| | | | | | | | | | | | | | | 11-30-09 | L |
| | | | | | | | | | | | | | | 1.46 | P |
| | | | | | | | | | | | | | | 89.69 | AB |
| | | | | | | | | | | | | | | 89.69 | AC |
| | | | | | | | | | | | | | | 89.69 | AE |
| | | | | | | | | | | | | | | 89.69 | AF |
| | | | | IR EFF 01-10 OLD .0388170 | NEW .0379420 | PRIN BAL | | | | BATCH 600 EDIT-SEQ 105688 | | | | | |
| | | | | PI EFF 01-10 OLD 1,754.31 | NEW 1,754.31 | PRIN BAL | | | | 514,517.15 | | | | | |
| 01-10 | 11-30 | 1 75 | 3 | 458.68 | 458.68 | 514058.47 | .00 | .00 | 1179.28 | 514,517.15 .00 | .00 | .00 | .00 | | 1 |
| | | | | | | | | | | MPL-ID GLBL | | | | | |
| | | | | | | | | | | | | | | 11-30-09 | L |
| | | | | | | | | | | | | | | 458.68 | AB |
| | | | | | | | | | | | | | | 458.68 | AC |
| | | | | | | | | | | | | | | 458.68 | AE |
| | | | | | | | | | | | | | | 458.68 | AF |
| | | | | | | | | | | BATCH 600 EDIT-SEQ 105688 | | | | | |
| 12-09 | 12-11 | 3 13 | 1 | CHECK #080786 | | | | 835.53- | 343.75 | PAYEE CD 310470101 | | | | | |
| | | | | | | | | | | | | | | .71 | P |
| 01-10 | 12-31 | 1 60 | 1 | 5.47 | .00 | 514058.47 | .00 | 5.47 | 349.22 | .00 | .00 | .00 | .00 | | 1 |

#9

**Exhibit U.S. Bank record FTIL Disclosure pg-1**

1

*BANK RECORD*

*FTIL Disclosure*

# FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Lender: **Downey Savings and Loan Association, F.A.**
3501 Jamboree Road, Newport Beach, CA 92660
Application / Loan Number: 9041823477          Re: **VICTORIANO BRAVO**
Date: **October 20, 2005**

*$481,401.88*

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCE | TOTAL OF PAYMENTS |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| **6.586 %** | **$995,154.79** | **$481,401.88** | **$1,476,556.67** |

PAYMENTS: Your payment schedule will be as follows -

| Number of Payments | Amount of Payments | | When Payments Are Due |
|---|---|---|---|
| 1 | $1,313.64 | Monthly Beginning: | 12/01/2005 |
| 11 | $1,313.64 | | 01/01/2006 |
| 12 | $1,412.16 | | 12/01/2006 |
| 12 | $1,518.07 | | 12/01/2007 |
| 2 | $1,631.93 | | 12/01/2008 |
| 441 | $3,218.05 | | 02/01/2009 |
| 1 | $3,208.32 | | 11/01/2045 |

Index Type **12MTA**          Current Index Rate **3.163**

☒ Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.
INSURANCE: The following insurance is required to obtain credit.   ☒ Property Insurance   ☐ Flood Insurance
You may obtain the insurance from anyone you want that is acceptable to the creditor.
SECURITY: You are giving a security interest in :
   **438 EAST 21ST STREET, BROOKLYN, NY 11226**

LATE CHARGE: If a payment is more than **15**   days late, you will be charged   **5.0000**   % of the overdue payment.
PREPAYMENT: If you pay off early, you
☒ may   ☐ will not have to pay a penalty.
☐ may   ☒ will not be entitled to a refund of part of the finance charge.
ASSUMPTION: Someone buying your property
☐ may   ☒ may, subject to conditions   ☐ may not assume the remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.
☒   (e) means an estimate

See attached Good Faith Estimate for settlement charges.
The undersigned acknowledge receiving and reading a completed copy of the disclosure.
Neither you nor the creditor previously has become obligated to make or accept this loan, nor is any such obligation made by the delivery or signing of this disclosure.

| | | |
|---|---|---|
| _VICTORIANO BRAVO_   10/20/2005 | (Date) | (Date) |
| (Date) | (Date) |
| (Date) | (Date) |
| (Date) | (Date) |

NOTE: Payments shown above do not include reserve deposits for taxes, assessments, and property or flood insurance.

REZ.UFF (05/10/04) CR12887 RG

**A. SETTLEMENT STATEMENT**   U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**HUD-1**
OMB No. 2502-0265

**B. Type of Loan**
1. ☐ FHA   2. ☐ FmHA   3. ☒ Conv. Unins.   6. File Number:   7. Loan Number: 9041823477   8. Mortgage Insurance Case Number:
4. ☐ VA   5. ☐ Conv. Ins.

**C. NOTE:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

**D. Name and Address of Borrower(s):**
VICTORIANO BRAVO
438 EAST 21ST STREET
BROOKLYN, NY 11226

**E. Name and Address of Seller(s):**
MOHAMMED SALAH UDDIN
MOHAMMED ZAFAR ULLAH
BIDYUT DAS

**F. Name and Address of Lender:**
DOWNEY SAVINGS & LOAN ASSOCIATION, F.A.
1100 E. WOODFIELD LAKE #433
SCHAUMBURG, IL 60173

**G. Property Location:**
438 EAST 21ST STREET
BROOKLYN, NY 11226

Place of Settlement:
1507 AVENUE M
BROOKLYN, NY 11230

**H. Name of Settlement Agent:**
SUSLOVICH & KLEIN, ESQS.

**I. Settlement Date:** 10-20-2005     **Funding Date:** 10-20-2005

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract sales price | 620,000.00 | 401. Contract sales price | 620,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 21,782.95 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes          to | | 406. City/town taxes          to | |
| 107. County taxes          to | 481.00 | 407. County taxes          to | 481.00 |
| 108. Assessments          to | | 408. Assessments          to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due From Borrower** | 642,263.95 | **420. Gross Amount Due To Seller** | 620,481.00 |
| **200. Amounts Paid By Or In Behalf Of Borrower** | | **500. Reductions In Amount Due To Seller** | |
| 201. Deposit or earnest money | 31,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 496,000.00 | 502. Settlement charges to seller (line 1400) | 22,112.72 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan      WASHINGTON MUTUAL | 369,328.13 |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes          to | | 510. City/town taxes          to | |
| 211. County taxes          to | | 511. County taxes          to | |
| 212. Assessments          to | | 512. Assessments          to | |
| 213. NON-DISC ADJUSTMENT | 500.00 | 513. NON-DISC ADJUSTMENT | 500.00 |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | 527,500.00 | **520. Total Reduction Amount Due Seller** | 391,940.85 |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross amount due from borrower (line 120) | 642,263.95 | 601. Gross amount due to seller (line 420) | 620,481.00 |
| 302. Less amounts paid by/for borrower (line 220) | 527,500.00 | 602. Less reductions in amount due seller (line 520) | 391,940.85 |
| **303. Cash ☒ From ☐ To Borrower** | 114,763.95 | **603. Cash ☒ To ☐ From Seller** | 228,540.15 |

*Handwritten notes in right margin:*
US Bank Record
SETTLEMENT STATEMENT 1

Principal (mortgage)
Amount 496,000.00


①

| | | Paid From Borrowers Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| L. Settlement Charges | | | |
| 700. Total Sales/Broker's Commission based on price $ @ % = | | | |
| Division of Commission (line 700) as follows: | | | |
| 701. $ 10,000.00 to FELIX RIOS REALTY | | | |
| 702. $ to | | | |
| 703. Commission paid at Settlement | | | 10,000.00 |
| 704. | | | |
| 800. Items Payable in Connection with Loan | | | |
| 801. Loan Origination Fee 0.5 % to ERETZ FUNDING, LTD. | | 2,480.00 | |
| 802. Loan Discount 0 % to DOWNEY SAVINGS & LOAN ASSOCIATION | | | |
| 803. APPRAISAL FEE TO ERETZ FUNDING, LTD. (POC $550.00) | | | |
| 804. CREDIT REPORT TO INFORMATIVE RESEARCH | | 12.00 | |
| 805. APPRAISAL REVIEW FEE TO DOWNEY SAVINGS & LOAN ASSOCIATION | | 65.00 | |
| 806. PROCESSING FEE TO ERETZ FUNDING, LTD. | | | |
| 807. DOCUMENT FEE TO DOWNEY SAVINGS & LOAN ASSOCIATION | | 200.00 | |
| 808. UNDERWRITING FEE TO DOWNEY SAVINGS & LOAN ASSOCIATION | | 325.00 | |
| 809. TAX SERVICE FEE TO LAND AMERICA NATIONAL LENDER SVC | | 56.00 | |
| 810. FLOOD DETERMINATION TO LAND AMERICA | | 8.00 | |
| 811. FLOOD MONITORING TO LAND AMERICA | | 4.00 | |
| 812. WIRE FEE TO DOWNEY SAVINGS & LOAN ASSOCIATION | | 50.00 | |
| 813. YIELD SPREAD TO ERETZ FUNDING, LTD. FROM DOWNEY SAVINGS (POC $11,160.00) | | | |
| 814. | | | |
| 900. Items Required By Lender To Be Paid In Advance | | | |
| 901. Interest from 10-20-2005 to 11- 1-2005 @ $ 88.3600 /day | | 1,060.32 | |
| 902. Mortgage insurance premium for months to | | | |
| 903. Hazard insurance premium for 1 year(s) to (POC $2207.00) | | | |
| 904. 1ST & 2ND QTR REAL ESTATE TAX TO PRECISION ABSTRACT (POC $1220.56) | | | |
| 905. 2004/2005 REAL ESTATE TAXES (POC $2441.12) | | | |
| 1000. Reserves Deposited With Lender | | | |
| 1001. Hazard insurance 3 months @ $ 183.92 per month | | 551.76 | |
| 1002. Mortgage insurance months @ $ per month | | | |
| 1003. City property taxes 5 months @ $ 203.42 per month | | 1,017.10 | |
| 1004. County property taxes months @ $ per month | | | |
| 1005. Annual assessments months @ $ per month | | | |
| 1006. 0 months @ $ per month | | | |
| 1007. months @ $ per month | | | |
| 1008. Aggregate Escrow Adjustment | | -407.03 | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee to | | | |
| 1102. Abstract or title search to | | | |
| 1103. Title examination to | | | |
| 1104. Title insurance binder to | | | |
| 1105. Document preparation to | | | |
| 1106. Notary fees to | | | |
| 1107. Attorney's fees to SUSLOVICH & KLEIN, ESQS. | | 850.00 | |
| (includes above item numbers: ) | | | |
| 1108. Title insurance to PRECISION ABSTRACT | | 3,608.00 | |
| (includes above item numbers: ) | | | |
| 1109. Lender's coverage $ 545,600.00 Premium $ 679.00 | | | |
| 1110. Owner's coverage $ 620,000.00 Premium $ 2,929.00 | | | |
| 1111. ENDORSEMENTS | | 75.00 | |
| 1112. OPEN WATER & SEWER FOR PRECISION | | | 447.72 |
| 1113. | | | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees: DEED, MORTGAGE, SAT | | 385.00 | 100.00 |
| 1202. City/county tax/stamps: | | | 8,835.00 |
| 1203. State tax/stamps: | | | 2,480.00 |
| 1204. NYS MORTGAGE RECORDING TAX PAID BY LENDER (POC $1364.00) | | 10,472.80 | |
| 1205. E-DOCS PREP | | | |
| 1300. Additional Settlement Charges | | | |
| 1301. SURVEY TO PRECISION ABSTRACT | | 115.00 | |
| 1302. COURIER FEE TO SUSLOVICH & KLEIN | | 20.00 | |
| 1303. MUNICIPALS TO PRECISION ABSTRACT | | 685.00 | |
| 1304. TITLE CLOSER | | 150.00 | 250.00 |
| 1305. | | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | 21,782.95 | 22,112.72 |



CERTIFICATION : I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I received a copy of the HUD-1 Settlement Statement.

_____          _____          _____          _____
Signature of Borrower                    Signature of Borrower                    Signature of Seller                    Signature of Seller

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds disbursed or to be disbursed by the undersigned as part of the settlement of this transaction.

_____                                         _____
Signature of Settlement Agent                                                    Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form.  Penalties upon conviction can include a fine and imprisonment.  For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**Exhibit U.S. Bank denied Modif pgs  1-2**

1

# usbank.

All of **us** serving you

3121 Michelson Drive, Suite 500
Irvine, CA 92612

*[handwritten: Denied Modif.]*

September 29, 2011

Victoriano Bravo
438 E 21st St
Brooklyn, NY 11226

Re:  Mortgage Loan 9041823477

*[handwritten: Pg 1]*

Dear Mortgagor(s):

U.S. Bank Home Mortgage has completed the review of information you
provided to be considered for a HAMP modification.  Unfortunately,
we are unable to proceed with modifying your mortgage under HAMP
because you do not meet the basic HAMP financial eligibility
requirement noted below:

   Excessive Forbearance – We are unable to offer you a HAMP
   modification because we are unable to create an affordable
   payment equal to 31% of your reported monthly gross income
   without changing the terms of your loan beyond the requirements
   of HAMP.

When we acknowledged receipt of your HAMP modification request, we
indicated that, in the event you were ineligible or unable to qualify
for a HAMP modification, we may then proceed to consider modifying
your loan pursuant to the Bank's FDIC Mortgage Loan Modification
Program.  We are proceeding to do so, and will soon provide you with
the result of that review.

Our HAMP decision was based in whole or in part on information obtained
from the following consumer credit reporting agencies:

   Trans Union            CSC Credit Services      Experian
   P.O. Box 1000          P.O. Box 619054          P.O. Box 2002
   Chester, PA 19022      Dallas, TX 75261-9054    Allen, TX 75013-2002
   800-888-4213           800-759-5979             888-397-3742

You have a right under the Fair Credit Reporting Act to know the
information contained in your credit file.  The reporting agency played
no part in our decision and is unable to supply specific reasons why we
have declined the HAMP modification.  You have a right to a free copy of
your report from the reporting agency if you request it no later than 60
days after you receive this notice.  If you find that any information
contained in the report is inaccurate or incomplete, you have the right
to dispute the matter with the reporting agency.

The Federal Equal Credit Opportunity Act prohibits creditors from
discriminating against credit applicants on the basis of race, color,
religion, national origin, sex, marital status, age (provided the



Member FDIC

# usbank.

All of us serving you

3121 Michelson Drive, Suite 500
Irvine, CA 92612

*Denied modif*

*P92*

9041823476

Page 2

We understand this may be difficult news for you, but the Program is specific to the types of mortgages, properties and income and expense requirements that can be considered for a modification.  There may be other options available that can help stabilize your mortgage and housing challenges such as a repayment plan, short sale or deed in lieu of foreclosure.  Please contact us at 800-824-6902, and ask for our Default Counseling Department to further inquire about eligibility requirements for these assistance options.

A HUD-certified housing counseling organization is an additional source of information to assist you.  To find a HUD-certified housing counseling orgaization in your area, visit the HUD website at www.hud.gov or call HUD's interactive voice system at (800)569-4287 or (888)995-HOPE.

If you are currently behind on your monthly mortgage payment and/or active in foreclosure, collection and foreclosure activities will continue on your account unless other arrangements are made.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.  The federal agency that administers compliance with this law concerning this creditor is the Comptroller of the Currency, Consumer Assistance Group, 1301 McKinney Street, Suite 3450, Houston, Texas 77010-9050.

If you have any questions about this notice or the reason(s) you were not approved, you may contact us toll-free at 800-824-6902 or at:

U.S. Bank Home Mortgage
Irvine Default Processing Center
3121 Michelson Drive Suite 500
Irvine, CA  92612

This communication is an attempt to collect a debt.  Any information obtained will be used for that purpose.

Sincerely,

FDIC Mortgage Loan Modification Team

LM281

usbank.com

Member FDIC

**Exhibit defendants  Proof of Claim  and U.S. Bank cover envelope pgs 1-4**

1

US Bank Proof of Claim
(1—4)

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

Article Sent To:

IRVINE CA 92612

| | | | |
|---|---|---|---|
| Postage | $ | $0.44 | |
| Certified Fee | | $2.85 | Postmark |
| Return Receipt Fee (Endorsement Required) | | $2.30 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $5.59 | 12/21/2011 |

7099 3400 0013 0887 8865

Name (Please Print Clearly) (to be completed by mailer)
US Bank
Street, Apt. No.; or PO Box No.
3121 michelson Drive
City, State, ZIP+4
suite 500 IRVINE CA 92612

PS Form 3800, July 1999

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 If Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1: Article Addressed to:

US Bank
3121 michelson Drive
ste 500
evine, CA 92612

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X R. O'Reilly   ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7099 3400 0013 0887 8865

PS Form 3811, February 2004   Domestic Return Receipt

#1

From: Victoriano Bravo

$bec-19-2011$

Downey Financial Corporation
3501 Jamboree Rd
Newport Beach, CA 92660
Send by US Certificate insures returns receive mail No. _____

FDIC as Receiver of Downey Savings
Attention: Claims Agent
1601 Bryan Street
Dallas, TX 75201
Send by US Certificate insures returns receive mail No. _____

And
US Bank
3121 Michelson Drive Suite 500. Irvine, CA 92612

Send by US Certificate insures returns receive mail No. 7099 3400 0013 0887 8865

Subject Property Address: 438 East 21st Street Brooklyn NY 11226

Subject Property Mortgage Loan Number: 9041823477

### VERIFICATION OF PROOF OF CLAIM

Notice to agents is notice to principals and notice to principals is notice to agents

Dear RESPONDENTS,

I have received your recent notice, I acknowledge that this account has been placed in delinquent status. My response your letter is as follows:

I, Victoriano Bravo as lawful authority as the Grantor, Maker and Settlor and of the Note & Deed; ask in a formal written request for the verification of proof of claim: Victoriano Bravo is making a good faith effort to confirm that you are still the RIGHTFUL Holder in Due Course the corresponding Promissory Note and that no other party may claim against the subject property under U.C.C-ARTICLE 3 -§3-302; hereby demand that you provide proof that you are in fact the rightful holder in Due Course and a real party in interest.

1)    Per UCC 3-3-501 (b) 2 (1), I demand that you present for my inspection the Original, Unaltered, Wet Ink Signature Promissory Note that that I signed and also provide a legal county clerk registered chain of assignments together with the Wet Ink Original Mortgage Agreement in, New York.(A Copy of the note or an affidavit of loss will not be accepted.)

2)    This is a formal Request for Accounting and Statement of Account of the alleged debt according to UCC 9-210. It is the belief that this alleged debt has been settled and the balance is $0.00. Accounting should be GAAP format, showing the source of the funding.

#2

3)     I further demand that a high level officer with authority to sign a letter upon your corporate letterhead, attest under penalty of perjury that you are or represent the real party in interest and currently are or represent the holder in Due Course.

4)     I demand all original signed mortgage loan documents to include original appraisal, loan application, Truth and Lending documentation, as well as a signed Good Faith Estimate.

5)     I demand the name of Trust and Trustee that this mortgage loan was assigned to

6)     I demand a copy of the Pooling and Servicing Agreement to the trust of this mortgage loan.

7)     I demand to know the name and address of the investor associated with this mortgage loan.

8)     If in fact is just a servicer individual or corporation , I demand that you or the authorized member identify both the Holder in Due Course with corresponding proof that they are in fact the Holder in Due Course as well as written authorization that entitles you as individual or as a corporation to service this instrument.

9)     If in fact is just a servicer individual or corporation , I demand that you or the authorized member identify both the Holder in Due Course with corresponding proof that they are in fact the Holder in Due Course as well as written authorization, city clerk assignment registration which entitles you as individual or as a corporation to serve this instrument and collect money from it.

10)     If you are a servicer, this notice of demand is presented to you and you have an obligation to notify him. Notice to agents is notice to principals.

11)     If you are unable to provide proof of claim, then you are not a party of interest and cannot rightfully enforce your claim under U .C.C- ARTICLE 3 § 3-301

12)     Under US Code Title 15 > Chapter 41 > SUBCHAPTER V > § 1692g part b), TILA and RESPA, this debt is now officially in dispute. By law, all collection activities must cease until this matter is resolved. You are hereby given notice. Blatant disregard for these laws are subject to fines by the FTC. You are advised to consult your legal counsel on this matter.

As the Maker of the note and Grantor of the security interest I constitute this to be a formal notice. Failure to respond to this letter through a verified proof claim within 21 days, point for point, will be taken as an administrative default by notary witness. Furthermore, the result of default by RESPONDENTS will be agreement between the parties that RESPONDENTS have no claim of rights, title or interest in subject property; and in matter of the alleged loan, performance is satisfied and the account is settled in full.

I ( Victoriano Bravo ) may appoint an Authorized Representative/ Trustee to release any lien or encumbrance and/or re-convey title to me (Victoriano Bravo )

This inquiring intend to legally solve this matter thus; we will only accept writing respond to these requests.

Sincerely, _____

Victoriano Bravo

**bank**

all of US serving you

...1 Michelson Drive, Suite 500
...ne, CA 92612

# US BANK
Respond
Envelope

Victoriano Bravo
438 E. 21st Street
Brooklyn, NY 11226

UNITED STATES POSTAGE
$ 03.080
02.1R.
000200220
MAILED FROM ZIP CODE 90638
JAN 12 2012

#4



From: Victoriano Bravo
428 - East 4th Street
Brooklyn, N.Y. 11218

CERTIFIED MAIL

7009 1410 0001 4937 0446

U.S. POSTAGE
PAID
BROOKLYN, NY
DEC. 21. 11
AMOUNT
$5.59
00020002-04

TO: DOWNEY FINANCIAL Corporation
3501 - Jamboree Road
Newport Beach, CA. 92660

11218@5922

NIXIE    917    CC 1    06    12/28/11

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 11218592236    *0816-05901-28-31

7009 1410 0001 4937 0446

U.S. Postal Service
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com®

| | |
|---|---|
| Postage | $ $0.44 |
| Certified Fee | $2.85 |
| Return Receipt Fee (Endorsement Required) | $2.30 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $5.59 |

Sent To Downey Financial Corporation
Street, Apt. No.; or PO Box No. 3501 Jamboree Road
City, State, ZIP+4 Newport Beach, CA. 92660

PS Form 3800, August 2006    See Reverse for Instructions

DOWNEY FC
PROOF OF Claim
(Was Returned)

RS 1-3

Dec- 19-2011

From: Victoriano Bravo

Downey Financial Corporation
3501 Jamboree Rd
Newport Beach, CA 92660
Send by US Certificate insures returns receive mail No. 7009 1410 0001 4937 0446

FDIC as Receiver of Downey Savings
Attention: Claims Agent
1601 Bryan Street
Dallas, TX 75201
Send by US Certificate insures returns receive mail No. _____

And
US Bank
3121 Michelson Drive Suite 500. Irvine, CA 92612

Send by US Certificate insures returns receive mail No. _____

Subject Property Address: 438 East 21st Street  Brooklyn NY 11226

Subject Property Mortgage Loan  Number: 9041823477

### VERIFICATION OF PROOF OF CLAIM

Notice to agents is notice to principals and notice to principals is notice to agents

Dear RESPONDENTS,
I have received your recent notice, I acknowledge that this account has been placed in delinquent status. My response your letter is as follows:
I, Victoriano Bravo as lawful authority as the Grantor, Maker and Settlor and of the Note & Deed; ask in a formal written request for the verification of proof of claim:  Victoriano  Bravo is making a good faith effort to confirm that you are still the RIGHTFUL Holder in Due Course the corresponding Promissory Note  and that no other party may claim against the subject property under U.C.C-ARTICLE 3 -§3-302; hereby demand that you provide proof that you are in fact the rightful holder in Due Course and a real party in  interest.

1)      Per UCC 3-3-501 (b) 2 (1), I demand that you present for my inspection the  Original, Unaltered, Wet Ink Signature Promissory Note that that  I signed and  also provide a  legal county clerk registered chain of assignments together with the Wet Ink Original Mortgage Agreement in, New York.(A Copy of the note or an affidavit of loss will not be accepted.)

2)      This is a formal Request for Accounting and Statement of Account of the alleged debt according to UCC 9-210. It is the belief that this alleged debt has been settled and the balance is $0.00. Accounting should be GAAP format, showing the source of the funding.

Dec 19 - 2011

3) I further demand that a high level officer with authority to sign a letter upon your corporate letterhead, attest under penalty of perjury that you are or represent the real party in interest and currently are or represent the holder in Due Course.

4) I demand all original signed mortgage loan documents to include original appraisal, loan application, Truth and Lending documentation, as well as a signed Good Faith Estimate.

5) I demand the name of Trust and Trustee that this mortgage loan was assigned to

6) I demand a copy of the Pooling and Servicing Agreement to the trust of this mortgage loan.

7) I demand to know the name and address of the investor associated with this mortgage loan.

8) If in fact is just a servicer individual or corporation , I demand that you or the authorized member identify both the Holder in Due Course with corresponding proof that they are in fact the Holder in Due Course as well as written authorization that entitles you as individual or as a corporation to service this instrument.

9) If in fact is just a servicer individual or corporation , I demand that you or the authorized member identify both the Holder in Due Course with corresponding proof that they are in fact the Holder in Due Course as well as written authorization, city clerk assignment registration which entitles you as individual or as a corporation to serve this instrument and collect money from it.

10) If you are a servicer, this notice of demand is presented to you and you have an obligation to notify him. Notice to agents is notice to principals.

11) If you are unable to provide proof of claim, then you are not a party of interest and cannot rightfully enforce your claim under U .C.C- ARTICLE 3 § 3-301

12) Under US Code Title 15 > Chapter 41 > SUBCHAPTER V > § 1692g part b), TILA and RESPA, this debt is now officially in dispute. By law, all collection activities must cease until this matter is resolved. You are hereby given notice. Blatant disregard for these laws are subject to fines by the FTC. You are advised to consult your legal counsel on this matter.

As the Maker of the note and Grantor of the security interest I constitute this to be a formal notice. Failure to respond to this letter through a verified proof claim within 21 days, point for point, will be taken as an administrative default by notary witness. Furthermore, the result of default by RESPONDENTS will be agreement between the parties that RESPONDENTS have no claim of rights, title or interest in subject property; and in matter of the alleged loan, performance is satisfied and the account is settled in full.

I ( Victoriano Bravo ) may appoint an Authorized Representative/ Trustee to release any lien or encumbrance and/or re-convey title to me (Victoriano Bravo )

This inquiring intend to legally solve this matter thus; we will only accept writing respond to these requests.

Sincerely,

Victoriano Bravo

FDIC Proof OF Claim (1-3)

FDS

# USPS.com® - Track & Confirm

| English | Customer Service | USPS Mobile | | | Register / Sign In |

≡ USPS

| Quick Tools | Ship a Package | Send Mail | Manage Your Mail | Shop | Business Solutions |

Search USPS.com or Track Packages

## Track & Confirm

You entered: 70993400001308878872

**Status: Delivered**

Your item was delivered at 9:17 am on January 06, 2012 in DALLAS, TX 75201.

Additional information for this item is stored in files offline.

You may request that the additional information be retrieved from the archives, and that we send you an e-mail when this retrieval is complete. Requests to retrieve additional information are generally processed within four hours. This information will remain online for 30 days.

First Name _____ M I ___ Last Name _____

Victoriano _____ Bravo _____

Email Address _____

☐ I would like to receive notification on this request

Restore

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

Article Sent To: •

DALLAS TX 75201

| | | |
|---|---|---|
| Postage | $ | $0.44 | 0348 |
| Certified Fee | | $2.85 | 08 |
| Return Receipt Fee (Endorsement Required) | | $2.30 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $5.59 | 12/21/2011 |

Name (Please Print Clearly) (to be completed by mailer)
D.E.C. DIRECTOR OF Deposit Insurance
Street, Apt. No.; or PO Box No.
HQ - Bryan Street
City, State, ZIP+4
Dallas, TX 75201

7099 3400 0013 0887 8872

PS Form 3800, July 1999          See Reverse for Instructions

#1

From: Victoriano Bravo

Dec 19-2011

Downey Financial Corporation
3501 Jamboree Rd
Newport Beach, CA 92660
Send by US Certificate insures returns receive mail No. _____

FDIC as Receiver of Downey Savings
Attention: Claims Agent
1601 Bryan Street
Dallas, TX 75201
Send by US Certificate insures returns receive mail No. 7099 3400 0013 0887 8872

And
US Bank
3121 Michelson Drive Suite 500. Irvine, CA 92612

Send by US Certificate insures returns receive mail No. _____

Subject Property Address: 438 East 21st Street Brooklyn NY 11226

Subject Property Mortgage Loan Number: 9041823477

### VERIFICATION OF PROOF OF CLAIM

Notice to agents is notice to principals and notice to principals is notice to agents

Dear RESPONDENTS,

I have received your recent notice, I acknowledge that this account has been placed in delinquent status. My response your letter is as follows:

I, Victoriano Bravo as lawful authority as the Grantor, Maker and Settlor and of the Note & Deed; ask in a formal written request for the verification of proof of claim: Victoriano Bravo is making a good faith effort to confirm that you are still the RIGHTFUL Holder in Due Course the corresponding Promissory Note and that no other party may claim against the subject property under U.C.C.-ARTICLE 3 -§3-302; hereby demand that you provide proof that you are in fact the rightful holder in Due Course and a real party in interest.

1)      Per UCC 3-3-501 (b) 2 (1), I demand that you present for my inspection the Original, Unaltered, Wet Ink Signature Promissory Note that that I signed and also provide a legal county clerk registered chain of assignments together with the Wet Ink Original Mortgage Agreement in, New York.(A Copy of the note or an affidavit of loss will not be accepted.)

2)      This is a formal Request for Accounting and Statement of Account of the alleged debt according to UCC 9-210. It is the belief that this alleged debt has been settled and the balance is $0.00. Accounting should be GAAP format, showing the source of the funding.

#2

**Exhibit U.S. Bank default notice pgs 1-2**

1

**usbank.**

U.S. Bank Home Mortgage
PO Box 6060
Newport Beach, CA 92658-6060

All of **us** serving you℠

October 20, 2011



6-726-75686-0001065-001-1-000-000-000-000

Victoriano Bravo
438 E 21st St
Brooklyn, NY 11226

DEFault
notice

RE:   Relationship Manager (Single Point of Contact)
      Mortgage Loan:  9041823477
      Property Address:  438 E 21st St
                         Brooklyn NY 11226

Dear Mortgagor(s):

Our records indicate that your loan was recently referred to foreclosure
or you expressed an interest in being considered for loss mitigation*
foreclosure alternatives. To ensure that you have an effective means of
communicating with us throughout the loss mitigation or foreclosure
process, a Relationship Manager has been assigned as your single point
of contact. The Relationship Manager will be your single point of
contact throughout the time you are being considered for any loss
mitigation foreclosure alternative or are active in foreclosure.  If your
loan ultimately proceeds through foreclosure, the Relationship Manager
will be available to respond to any inquiries you may have regarding
the status of the foreclosure.  Your Relationship Manager is
ROBERT ROMERO, who you can contact directly by phone toll-free at
1-855-MYUSMAP (1-855-698-7627), ext. 798-6726 or by email at
robert.romero@usbank.com, Monday through Friday from
7:00 a.m. to 8:00 p.m. Central Standard Time.

Your Relationship Manager will provide you with direct contact
information so that you can easily access your account information.
We are committed to customer satisfaction, and your Relationship
Manager will offer the highest level of service you deserve. Your
Relationship Manager is an accessible and reliable contact for you, who
is knowledgeable and who has access to current information and personnel
sufficient to timely, accurately and adequately assist you.

In addition to your Relationship Manager, we understand that you may
from time to time work directly with one of the Bank's loss mitigation
or foreclosure processors. If you work with a processor, you are
welcome to continue doing so if that is your preference.

*"Loss mitigation" refers to foreclosure alternatives solutions such
as loan modification forbearances, loan restructures, short sale and
deeds-in-lieu of foreclosure.

**usbank.com**

Member FDIC  EQUAL HOUSING LENDER



All of **us** serving you®

3121 Michelson Drive, Suite 500
Irvine, CA 92612

9041823477                                                        Page 2

If you have any questions about this notice or the reason you are
ineligible for the short sale option, you may contact us toll-free
at 800-824-6902 or at:

                    U.S. Bank Home Mortgage
                    Irvine Default Processing Center
                    3121 Michelson Drive, Suite 500
                    Irvine, CA  92612

If your loan is delinquent, this notice is an attempt to collect a debt
and any information obtained will be used for that purpose.  If you have
received a bankruptcy discharge and the loan was not reaffirmed in that
bankruptcy case, this notice is for informational purposes only and is
not an attempt to collect the discharged debt from you.


Sincerely,


Default Resolution Department

LM925

**usbank.com**

Member FDIC

# Litigation Notification

Notice: CLG-13003494
Notice Date: 12/9/2011

Form: T - 008-1
Year: 2011

Control: 13003494

To Call For Assistance:
**800-331-7840**

Contact: Litigation Department
Administrative Office

nse Requested By | **12/30/2011**

## are you getting this notice?

...ice is intending to file a claim against your lender Downey S&L ...a aimed at improper lender actions. Records indicate that you may ...a potential plaintiff in a national lawsuit. It is imperative that you contact our offices immediately. To learn more or opt in, CALL **800-331-7840**.

The goal is to reduce your interest rate, reduce your monthly payment and/or potentially reduce your principal balance. Additionally, we may seek monetary relief, intend to delay or stop forecosure, and/or seek compensation for damages.

### Case Details

- **Seeking Monetary Damages per Individual**
- **Investigation of Potentially Fraudulent Mortgage Note**
- **Multiple Claims of Fraud and Misrepresentation**
- **Reduction or Forgiveness of Loan**

Next Step is to Call >> >> >> | **800-331-7840**

## 2 | What happens if you don't respond by 12/30/2011

You may be excluded as a plaintiff of a National Lawsuit against Downey S&L Assn Fa, **don't delay, case settlement time will vary from case to case.** When calling please reference **file number 13003494**.

## Call 800-331-7840 to Confirm Eligibility Prior to 12/30/2011

*This information was obtained through public record sources; The Resolution Law Group, P.C., is not sponsored or affiliated with your lender Downey S&L Assn Fa and is not affiliated, approved or endorsed by any agency of the government. Pre-selection criteria and audit of home loan consists of loan amount, loan to value percentages, date of loan, and residential jurisdiction. Eligibility status for representation is based on numerous criteria, including but not limited to lender participation in loss mitigation negotiations, LTV restrictions, loan amount, verifiable client ...rdship, bankruptcy law, monthly payments, and/or principal reduction. Lower monthly payments and debt forgiveness are Potential ...ments but will vary case to case. We do not guarantee a successful outcome and recommend you seek legal advice before deciding to ...q your mortgage; you could potentially lose your home and damage your credit rating. This advertisement does not contain or ...al advice. Licensed to Practice Law in CT and CA. 500 West Putnam Ave, Suite 400; Gre...wich, CT 06830